Filed 4/16/15  Certified for partial publication 5/13/15 (order attached); modified 5/13/15 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>v.<br><br>ROSA PUI HILL et al.,<br><br>　　　　Defendants and Appellants. | A133121<br><br>(Alameda County<br>Super. Ct. No. C162185A) |

## I.  INTRODUCTION

The crimes alleged in this matter arose out of a custody dispute between estranged spouses Rosa Hill and Eric Hill.  Appellants Rosa Hill and her mother, Mei Li, appeal from the judgment following their conviction by a jury of the first-degree murder of Selma Hill (Eric Hill's grandmother) and the attempted premeditated murder of Eric Hill.  Mei Li was also convicted of first-degree burglary of Selma Hill's residence.[1]

On appeal, Mei Li raises several claims of instructional error.  Rosa Hill argues the trial court erred in admitting her pretrial statement and failing to answer a question from the jury during deliberations.  She also raises claims of prosecutorial misconduct and ineffective assistance of counsel.  Both appellants argue the evidence was insufficient to support the attempted murder conviction and cumulative error.  Each appellant joins in

---

[1] A third co-defendant, Ping Li (Rosa Hill's father and Mei Li's husband), was also charged in this matter.  His case was severed from the trial of the other two defendants.  In her opening brief, Rosa Hill states that he pled guilty to violations of Penal Code sections 32 and 459, and was sentenced to four years imprisonment.

the arguments of the other pursuant to California Rules of Court, rule 8.200, subdivision (a)(5). Finding merit to one of Mei Li's claims of instructional error, we will reverse her conviction for the murder of Selma Hill.[2] We affirm the judgment in all other respects.

## II. FACTUAL AND PROCEDURAL BACKGROUND

On November 17, 2009, the Alameda County District Attorney filed an information against Ping Li and appellants Rosa Hill and Mei Li.[3] Count one charged Rosa and Mei with the murder of Selma, in violation of Penal Code section 187, subdivision (a).[4] In connection with count one, the information alleged the felony-murder special circumstance that Rosa committed this offense in the course of a burglary, within the meaning of section 190.2, subdivision (a)(17),[5] and that Rosa and Mei were armed with firearms within the meaning of section 12022, subdivision (a)(1).

Count two charged Ping and appellants Rosa and Mei with the premeditated attempted murder of Eric, in violation of sections 187, subdivision (a), and 664, subdivision (a). In connection with count two, the information alleged that Rosa personally used a firearm within the meaning of sections 12022.5, subdivision (a), and

---

[2] Shortly before oral argument in this matter, Mei Li's counsel submitted a letter drawing to the court's attention two cases filed after briefing was complete, *People v. Chiu* (2014) 59 Cal.4th 155 and *People v. Smith* (2014) 60 Cal.4th 603, which address the natural and probable consequence theory of aiding and abetting. At oral argument, we set a schedule for supplemental briefing regarding these two cases. Having now reviewed those briefs, we agree with the parties that, under *People v. Chiu*, the jury in this case was erroneously instructed on aider and abettor liability for first degree murder under the natural and probable consequences doctrine. However, in light of our reversal of Mei Li's first degree murder conviction on another ground, as explained herein, we need not address the parties' contentions regarding *Chiu*.

[3] Because several individuals involved in this matter share the same last names of Hill and Li, in the interests of clarity and readability, we will hereafter refer to them by first names; no disrespect is intended.

[4] Unless specified all further statutory references are to the Penal Code.

[5] We note that the information alleged the underlying felony of burglary but cited to section 190.2, subdivision (a)(17)(A), which specifies the underlying felony of *robbery*. The parties raise no issue in this regard; thus, we will presume, as they apparently did, that subdivision (a)(17)(G), specifying *burglary*, was intended.

2

12022.53, subdivision (b), and that Ping and Mei were armed with firearms within the meaning of section 12022, subdivision (a)(1).

Count three charged Ping and Mei with residential burglary of Selma's home, in violation of section 459.[6]  In connection with count three, the information alleged that Ping and Mei were armed with firearms within the meaning of section 12022, subdivision (a)(1).

On March 5, 2010, the trial court granted Rosa's motion to set aside the special circumstance allegation.

On March 7, 2011, the trial court granted Ping's motion to sever.

Rosa and Mei were tried together by a jury between March 16 and June 28, 2011.

A. *Prosecution Case*

1. *Eric And Rosa*

Eric and Mei both worked at the Alameda County Social Services Office in Oakland as eligibility technicians.  Mei introduced Eric to her daughter, Rosa, in late 2002.  Eric and Rosa began seeing each other in early 2003 and married in April 2005.  They lived with Mei and Ping in Antioch for four or five months before purchasing a condominium in Fremont.  They had a child together, a daughter, Elizabeth, who was born in June 2006.

Upon Eric's return to work from paternity leave, supervisors complained about his job performance.  Eric believed his work was adversely impacted by medication he took to control his mental illnesses, which included severe depression, visual and auditory hallucinations, and suicidal tendencies.  His symptoms became worse when he stopped taking his medication.

Eric had a history of mental problems dating back to high school.  In 2004, after Rosa saw Eric put a knife to his wrist, he took time off work and went to a Kaiser intensive outpatient program (IOP) designed to deal with depression and associated suicidal thoughts.  His treating psychiatrist, Dr. Cohen, advised Rosa to supervise Eric

---

[6] Rosa was not charged with a separate count of burglary.

3

and to remove all knives and sharp objects from the home.  In 2005, Eric had a breakdown at work and was driven to the emergency room by his supervisor.  He was placed back in the IOP.  In 2007, Eric was not in therapy but spoke to Dr. Cohen on the phone from time to time.  By the time of trial in 2011, Eric self-reported that he was not on any medication and was feeling fine.

In early 2007, Eric and Rosa were having problems in their marriage; they separated in March.  Eric moved out and went to live with his grandmother, Selma, in Dublin.  Rosa had custody of Elizabeth after the couple separated.  Eric initiated legal proceedings for full legal and physical custody in May 2007 after being informed by Carolyn Lacativo of Child Protective Services (CPS) that she thought Rosa was a danger to Elizabeth due to Rosa's paranoid tendencies and erratic behavior.  Rosa accused Eric of molesting Elizabeth; Eric denied the allegations.

The Alameda County family court assigned Dr. Phillip Montes, a psychologist, as the mediator in the case.  The court ordered both Rosa and Eric to undergo psychiatric evaluations by Dr. Randall Kolin.  At the next hearing, the court split legal and physical custody equally between Eric and Rosa.  During the year and a half of custody litigation, Eric complained to Dr. Montes about Rosa, including that she disrupted daycare, did not put Elizabeth in daycare as instructed, was overfeeding Elizabeth and that she did not return her on time after Thanksgiving.  By August 2008, Eric had physical custody of Elizabeth 85 percent of the time and 100 percent legal custody.

In January 2009, Eric and Elizabeth were living with Selma, who was 91 years old and in declining health.  She was approximately five feet tall, "heavy," and had poor eyesight.  She had difficulty moving around and she sometimes used a walker to maintain her balance.  Selma was romantically involved with Lester Rowe, and would spend Thursday until Sunday at his condominium in Fremont.  Lester was 90 years old and dying of bladder cancer.  Lester regularly called Selma at 4:00 p.m. on the days they were not together.

4

2. *Events Of January 7, 2009*

On January 7, 2009, Eric and Elizabeth left the house around 7:00 a.m., before Selma woke up, and Eric went to work after dropping Elizabeth at daycare.

Shortly after 5:00 p.m., Lester telephoned his son and daughter-in-law, Jeffrey and Ute Rowe. He explained that he had been trying to reach Selma by telephone for the last hour, and it was very unusual that she had not answered. Lester was very upset. Jeffrey and Ute agreed to drive to Selma's residence to check on her. They arrived around 5:30 p.m. and found nothing unusual. Ute knocked and rang the doorbell several times, while Jeffrey checked the back yard. Finding nothing, they agreed to wait for Eric to arrive.

Eric and Elizabeth arrived shortly before 6:00 p.m. Jeffrey and Ute introduced themselves to Eric and explained why they were there. They all went into the house through the garage, with Eric carrying Elizabeth in his arms.

Jeffrey and Ute waited in the family room while Eric carried Elizabeth upstairs. When Eric went into his grandmother's room, he saw Mei crouching near the closet. He felt confused and worried because Mei should not have been there; she did not have a social relationship with Selma.

Eric asked Mei what she was doing there. She stood up but did not answer. Eric put Elizabeth down and asked where his grandmother was. When Mei said Selma "was out shopping," Eric knew something was not right. Then he asked Mei how she got into the house. Mei said she came "through the door in the garage." Eric "got scared" and "thought something may have happened to" Selma. He "started running towards the garage."

As Eric hurried toward the stairs, "Rosa ran out of the baby's room and charged" toward him. She wore a dark jacket and a black ski mask. He felt a bump on the back of his head and heard popping noises. He fell down in the hallway and the two women hit him all over his body. Rosa used a hand-held stun gun to stun Eric repeatedly in the legs and lower back, while Mei hit Eric with a baton. Eric yelled, "Help, Jeff, help."

Downstairs, Jeffrey and Ute Rowe heard two or three popping noises, followed by Eric screaming, "What are you doing? What are you doing?" Worried that they had

5

heard gunshots, they ran next door to the home of a neighbor, who called 911. Jeffrey, Ute and the neighbor went back to Selma's house, where they heard more popping sounds. The neighbor heard Eric screaming, "Wait. Wait. Wait."

Meanwhile, Eric felt blood dripping down his face and he realized he was in a fight for his life. He testified that in 2009, he weighed 265 pounds and that Rosa and Mei each weighed around 100 pounds. Eric stood up and pushed Mei away, but Rosa knocked him down again. He was hit multiple times with stun guns. Eric managed to get the baton and was hitting someone with it. He kicked Rosa into the baby's room, but she came out again and hit him with the stun gun while telling him to shut up and stop moving. At this point, Eric saw that Rosa was holding a gun to his chest. He stopped fighting and lay still on the floor. Mei pushed the baton down on Eric's throat and began choking him. Both Mei and Rosa insisted that Eric give up custody of Elizabeth. They demanded, "Are you going to give up Elizabeth? Will you give up Elizabeth? Can Rosa have Elizabeth?" Eric agreed to give Elizabeth to them because he did not want to die.

At that point, Eric heard sirens outside. Rosa ran to the window while Mei held the baton to his throat. Rosa returned to the bedroom doorway, pointing her gun at Eric. He could hear police officers in the house.

Deputies of the Alameda County Sheriff's Office arrived at Selma's house at 5:53 p.m. They heard screaming and yelling from inside the house and a male voice saying, "Please don't kill me. I don't want to die. Please don't."

The deputies went upstairs with their weapons drawn. They found Eric on his knees in the hallway. Mei was bleeding from the head and standing near unspent bullets, an "electronic stun device" and a "collapsible baton." Eric suddenly darted into a bedroom, and Deputy Daniel Molleson deployed his Taser to incapacitate him. Deputy Jared Hattaway ordered Mei to drop to her knees and raise her hands. Deputy Hattaway heard Eric shouting that Mei and Rosa had a gun and that his two-year-old daughter was in the house. Hattaway asked Mei where the child was, but she did not respond. When he asked her again, she pointed to a bathroom. Looking into a mirror on the bathroom wall, Hattaway saw the reflection of Rosa, "standing very still," in a nearby bedroom.

6

Hattaway ordered Rosa to come out of the bedroom with her hands raised. She complied. Hattaway discovered a second electronic stun device in that bedroom. He found Elizabeth crying in the bathroom.

Deputies removed Rosa and Mei from the residence and searched them. Rosa was wearing a long black coat with mud and dirt on it and multiple layers of clothing. A small unloaded black handgun was found in her jacket pocket. Mei was wearing a heavy tan coat and black pants. She told an officer she had a stun gun in her pocket, which was removed. Mei was taken to the hospital and treated for her head wound.

Deputy Mitchell Mensinger located Rosa's father, Ping, slouched down in the driver's seat of a gray Prius that was parked across the street and several houses down from Selma's house. The vehicle was registered to Ping. Inside the Prius, Mensinger found a pink and black backpack belonging to Mei which contained her business cards, her driver's license, a flashlight, a red wig, pepper spray, a headlamp and directions to Selma's house.

Officers also found a black backpack with no identifying information in Selma's back yard near the fence. It contained a pocket saw, packaging tape, a master long-cast fishing reel, a rope, crossbow arrows, a knife, a pry bar and .22-caliber ammunition.

Criminalists of the Alameda County Sheriff's Crime Lab processed the crime scene. Numerous items were retrieved from the upstairs area of the house, including unfired .22-caliber bullets, a Taser, a knife within a sheath, latex gloves, a duty belt, a retractable baton and a stun gun.

Deputies searched the back yard and found no evidence of a struggle. They cut the padlock on a storage shed. Inside the shed, they found Selma's body in a garbage can. The body was wrapped in blue sheets. There were plastic grocery bags on the body's head, neck and hands; a white rope was wrapped around the body.

Selma's autopsy revealed blunt injuries to the head and neck area, along with "heat effect" wounds on the right hand, arm and torso that could have been caused by a Taser. The pathologist testified that the cause of death was asphyxiation due to strangulation associated with multiple blunt injuries.

### 3. *Police Investigation*

Deputies impounded Rosa's Acura Integra, which she had parked near Selma's home. Deputy Scott Busby searched the vehicle and found a crossbow, a crossbow bolt, a box of .22-caliber bullets and packaging for a glass cutter. A black duffle bag contained numerous items including handcuffs/leg irons, pepper spray, a hacksaw, a camping axe, a pry bar and a rubber mallet. Deputy Busby also found a blue coin purse containing $2,000 in cash, an envelope holding another $432.06 and a samurai sword with "a holding strap of the kind commonly used to carry over your shoulder."

On January 8, 2009, deputies executed a search warrant on a residence in Antioch. They found mail addressed to Mei, Ping and Rosa, and recovered a computer and a .38-caliber revolver registered to Ping. Deputy Andrew Brosi, a computer forensics expert, analyzed the computer and found, under a user account labeled "Mei Li," internet searches for the terms "taser gun, stun guns," "gun silencer" and "how to break into a house."

Deputies determined that Mei and Ping maintained a second residence. On January 20, 2009, deputies executed a search warrant on a residence in Brentwood. Inside, they found indicia that Mei and Rosa resided in the home, including bills and a pay stub in Mei's name and job applications in Rosa's name. In the kitchen, deputies found printed documents and handwritten notes. One internet printout contained information on chloroform and "poisons and antidotes." Other printouts were titled "Medications That Can Cause Confusion in Elderly Persons" and "Medications That Should Be Avoided If Possible When Certain Diseases Are Present." In one notebook, there were recorded movements of vehicles, including Eric's, at Selma's residence, as well as the time the garage door opened. Rosa later testified that she "was interested in the company that Eric was keeping."

In the dining room of the Brentwood residence, deputies found handwritten notes, several of which were read for the jury: "Crime equals desire, ability, opportunity. [¶] Flashlight . . . as a weapon to hit at forehead, wrist, critical PTS that they cannot hit back. Knuckles can do the job. [¶] Palm to chin, down to up, low to high, go back to neck, that

8

tall person may fall back. [¶] Ask . . . in a strong voice, the other party may feel compelled to answer. [¶] Pepper spray . . . does not work on everybody. Tear gas, a guy says give me more." Another handwritten note contained references to "angel of death trial," "toxicology," "arsenic," "traceless death" and "poison tablet."

In the master bedroom/bathroom, deputies found indicia in Mei's name. They also found notes for a "revenge spell" against "Eric Hill, Gregory Hill, Selma," and a note that referred to "Eric Hill and Selma Hill" as "troublemakers."

Deputy Brosi analyzed the hard drives of several computers seized from the Brentwood residence. He found internet searches for "traceless suicide," "poison death by touch," "homemade silencer," "how suicide," "strychnine" and "cyanide." There were also internet searches for "how to murder," "gun shows," how "to get away with murder," "punishment for murder" and "how to strangle."

A Verizon Wireless cell phone analyst examined the cell phone records of Rosa, Mei and Ping's cell phones. Rosa's cell phone made a series of ten calls to Mei's cell phone from 11:46 a.m. to 5:15 p.m. on January 7, 2009. Mei's phone connected through cell towers in Oakland until 5:05 p.m., at which point the remaining calls (at 5:05 p.m., 5:11 p.m., 5:12 p.m. and 5:15 p.m.) were processed through towers in Dublin and Pleasanton.

A criminalist working for the sheriff's office and qualified as an expert in DNA testified that she tested the Taser and the baton found upstairs in Selma's house. The contributing DNA sample taken from the Taser barb could not exclude Selma. The baton sample had a mixture of DNA present that included at least two sources; the majority was consistent with Eric's DNA and the minority was consistent with Mei's DNA. Rosa, Ping and Selma were all excluded from the baton samples.

An employee from Taser International testified that in order to activate a Taser, the individual must pass an online or telephone background check and the name on the credit card used to pay the activation fee must match the name used for the background check. Two Tasers were activated in Mei's name on December 24, 2008. The Taser employee could not tell whether the background check was conducted online or over the

9

telephone. Mei's supervisor testified that Christmas Eve was a scheduled work day for Mei. Rosa testified that she activated the Tasers in Mei's name because she purchased the Tasers for Mei. An employee from the Antioch Armory testified that two Tasers and pepper spray were sold to an older Asian couple on December 24, 2008.

Robert Spellacy, who sold guns at a Reno, Nevada, gun show in October 2008, testified that he sold a .32-caliber gun to Rosa and Mei in a private sale for $200 in cash. A .32-caliber revolver was recovered from the trunk of the Acura.

B. *Defense Case*

Rosa testified that she was born in Hong Kong and lived there until the age of 11, when her family immigrated to the United States. She grew up in San Leandro and graduated from U.C. Davis with a degree in applied mathematics. She had no prior criminal record.

1. *Rosa And Eric*

She met Eric in October 2002. During a trip to Yellowstone in May 2003, he exhibited aggressive behavior and had panic attacks. She tried to break off the relationship several times, but he would cry and say he could not live without her. During one of these events in June 2004, Eric put a knife to his wrist. She told him he had to get help, and she took him to see Dr. Peter Cohen, a psychiatrist at Kaiser.

Dr. Cohen testified that he first saw Eric in June 2004. Eric had been cutting himself for three weeks prior to the appointment, and had previously tried to eat or drink himself to death. He complained of depression and suicidal feelings. Dr. Cohen recommended inpatient treatment, but he agreed to an intensive outpatient program and prescribed Prozac after Rosa agreed to monitor Eric and to remove sharp objects from the house. Eric saw Dr. Cohen in February 2005; he reported that he had been doing fine until he got the flu and stopped taking Prozac, at which time his symptoms got worse and he experienced visual and auditory hallucinations.

Rosa and Eric were married in April 2005. During their honeymoon, Eric stopped taking his medication so he could drink alcohol. He became angry and had outbursts. That summer, Eric's supervisor took him to the emergency room because of a mental

breakdown. Eric was hospitalized briefly. Dr. Cohen noted that he was off Prozac and his hallucinations returned, although Dr. Cohen did not consider him suicidal. Eric returned to the IOP.

The couple's daughter Elizabeth was born in June 2006. Later that year, Eric stopped taking his medication because he did not want to fall asleep at work. His supervisor wanted to terminate him, so Mei suggested he contact his union representative. In early 2007, he met with union shop steward Ruth Levin, who helped him avoid losing his job.

During this time period, Rosa began to notice that when she shared a meal with Eric, she would become extremely drowsy and pass out. She had no symptoms when she prepared the meal herself, and feared that Eric was putting medication in her food. In March 2007, Eric told her that he heard voices telling him to push children into traffic. Rosa was very worried and told Eric to talk to Dr. Cohen. On March 13, Eric admitted to Dr. Cohen that he was hearing voices that told him to hurt people. Eric was diagnosed with major depression recurrent with psychotic features.

Several incidents in early 2007 led Rosa to believe that Eric was molesting Elizabeth. Rosa awoke one night and saw Eric with his hand down Elizabeth's diaper. Another time, Rosa saw a cut on the baby's chest. Eric said he had been changing her. When Rosa tried to talk to him, he walked away. The next day, they took Elizabeth to Rosa's parents' house. When Mei gave the baby a bath, she noticed that her vaginal opening was unusually large and there was discharge. There were times when Eric was holding Elizabeth on his lap and he had an erection.

Rosa saw her primary care physician, Dr. Quin Huffman, in March 2007. She told Dr. Huffman that she suspected Eric of putting medication in her food. A urine toxicology screen was negative for codeine. She also told the doctor she suspected Eric of sexually abusing Elizabeth. Dr. Huffman told Rosa that she was required by law to report the matter to CPS. Dr. Huffman also contacted Kaiser Social Services, advised Rosa to take Elizabeth to her pediatrician and referred Rosa to a Kaiser crisis counselor.

The crisis counselor advised Rosa to contact Eric's psychiatrist and make an urgent appointment with her pediatrician. She also reported the matter to CPS. The individual she spoke with at CPS was Ruth Levin.

Levin did not immediately recognize Eric as the person she had assisted as a shop steward, but she did realize it at some point. Levin screened the call and classified the case as emotional abuse rather than sexual abuse because the report did not come from the child or a witness to sexual abuse. She assigned the case to Carolyn Lacativo and Levin's involvement in the case ended.

Rosa moved with Elizabeth to her parents' home in Antioch. Rosa reported the abuse to the Fremont police department, which recommended that she take Elizabeth to Children's Hospital for an exam. Dr. Rachael Gilgoff, a child abuse pediatrician, examined Elizabeth on March 29, 2007. The exam was normal, but Dr. Gilgoff testified that this did not rule out sexual abuse.

The Fremont police investigated but concluded there was not enough evidence to pursue the case.

Lacativo from CPS testified that she was concerned about Elizabeth when she heard the allegation that Eric had experienced recent hallucinations telling him to push children into the street. She interviewed Rosa and was told by the Fremont police that there was no evidence to prove that Eric had molested Elizabeth. Lacativo also testified that Rosa was not cooperative with her investigation. It was difficult to get Rosa to meet with her. She learned that Rosa was living with her parents, but Rosa and Mei refused a home visit. Finally, Lacativo met with Rosa, Mei and Elizabeth at the social services office in Hayward.

Rosa testified that she thought CPS was biased against her because Levin had helped Eric with his demotion at work. Rosa said she had trouble contacting Lacativo, not the other way around, and that Lacativo was very upset that Rosa wanted to meet her at her office rather than at her parents' home.

When Eric and Rosa separated in March 2007, Rosa retained custody of Elizabeth. Eric testified that he began legal proceedings to obtain custody after Lacativo called him

and told him she considered Rosa a danger to Elizabeth because of her paranoid tendencies and erratic behavior. Lacativo denied she said that to Eric. Lacativo admitted, however, that she and Rosa had a hostile relationship and that Rosa had filed a formal complaint against her.

In the custody matter, at some time prior to June 21, 2007, the court issued a restraining order that gave Rosa sole legal and physical custody and ordered that Eric have no contact with Elizabeth. On July 31, 2007, Eric was granted temporary sole legal and physical custody for one week. On August 7, the court ordered joint legal and physical custody, awarding 50 percent to each parent. On February 13, 2008, the court increased Eric's custodial time and decreased Rosa's. Minor changes to custodial time were made in May and August 2008; the court gave Eric sole legal custody in August 2008. The matter was set for trial in November 2008. Trial was then reset for February 2009.

The court generally followed the recommendations of its mediator, Dr. Phillip Montes. In turn, Dr. Montes relied on data provided by Lacativo. As the case progressed, Dr. Montes recommended that Eric have greater physical custody because he was convinced that Rosa had mental health problems. Dr. Montes concluded from the Fremont police report that Eric did not molest Elizabeth.

Rosa tried unsuccessfully to convince Dr. Montes that she did not have a mental illness. Randall Kolin, Ph.D., conducted psychological evaluations of both Rosa and Eric in August 2007 at the request of the court. Dr. Kolin found that Rosa was overwhelmed with stress and anxiety but there was no indication of paranoia. Dr. Kolin found that Eric had a severe impairment in his reality testing; he advised the court that Eric might be experiencing some psychotic symptoms.

In an August 31, 2007 report, Lacativo stated that she considered Elizabeth to be safe with Eric, but she remained concerned about Rosa's mental status. Lacativo concluded that Rosa was making false allegations against Eric to alienate Elizabeth from him.

13

Between June 2007 and April 2008, Rosa saw Dr. Carrie Kelley Skarda, a psychologist at Kaiser in Antioch.[7] Dr. Skarda thought Rosa was stressed but had good judgment and insight. Upon learning that Dr. Montes thought Rosa was delusional, Dr. Skarda sent him a letter stating that Rosa was not suffering from a delusional disorder. On her own initiative, Rosa underwent a psychological evaluation at Portia Bell Hume Behavior Health Center in April 2008. The evaluators concluded that Rosa had an adjustment disorder, and they ruled out any delusional disorder or paranoia.

Rosa thought that by seeing Dr. Skarda and undergoing the evaluation at the Portia Bell Hume Center, she was in full compliance with the court's wishes. Rosa felt that, instead of protecting Elizabeth, the court process was hurting her and it was taking a toll on Rosa as well. When Elizabeth would cry out, "No, Daddy, no," in the middle of the night, Rosa thought Elizabeth was still being abused. Yet, the mediator continued to reduce her amount of physical custody of Elizabeth. Dr. Montes had concerns about Rosa spending three hours a day at the daycare center; he believed this interfered with what the court had designed as a safe place for Elizabeth. According to Dr. Montes, because of Eric's susceptibility to depression, it was crucial that the stability and support provided by the daycare center be maintained. Dr. Montes asked the court to ban Rosa from the daycare center and that she be arrested if she appeared there.

After Rosa was prohibited from seeing Elizabeth at the daycare center, she missed her terribly. Elizabeth seemed scared and reluctant to leave Rosa at the end of her visits. Rosa started to panic and worried that Eric might have a psychotic breakdown and hurt Elizabeth.

On the weekend preceding January 7, 2009, Mei told Rosa that Elizabeth pointed to the area between her legs and said "owie" and that "Daddy did it." Elizabeth told Rosa she did not want to go see her Daddy. When Rosa returned Elizabeth to Eric after that weekend, Elizabeth was shaking badly and whispered in Rosa's ear, "Help me, Mommy." Rosa was panicking over what would happen to Elizabeth while in Eric's care.

---

[7] Rosa discontinued seeing Dr. Skarda when the doctor moved away from California.

2. *Events Of January 7, 2009*

Early on the morning of January 7, 2009, Rosa awoke from a nightmare in which Elizabeth was screaming, "no, Daddy, no." She felt compelled to go and check on her safety. She left the house, taking with her a gun, a stun gun, and a Taser in case Eric became violent. She drove to Selma's house in Dublin, parked around the corner, and climbed onto a second-story balcony. She testified that when she looked in the window, she saw both Eric and Elizabeth lying naked on a futon. Eric was fondling her and had an erection.

Rosa was not sure what to do. She climbed down from the balcony and rang the doorbell but there was no answer. She did not call the police because she could not prove what she saw. She testified that she was "just so emotionally overwhelmed that I couldn't leave Elizabeth with Eric anymore." She saw Eric leave for work.

Rosa went into the back yard and heard Selma open the door on the side of the garage. Rosa thought Selma was unaware of what Eric was doing and that, if she knew, she would help protect Elizabeth. Rosa talked to Selma, and the two women went into the garage through the side door. Rosa told Selma about the molestation, hoping that Selma would withdraw her financial support from Eric. Selma responded that Eric was Elizabeth's father and that he could do whatever he wanted. Rosa was shocked, upset and angry.

Selma grabbed what looked like a knife or a box cutter and appeared to swing it at Rosa, pointing it toward her face. Rosa grabbed a broom and hit Selma several times with it. She testified that, "I got really angry. I lost it." Rosa tased her and shoved her with the broom. Selma fell back and started gagging. Rosa used a stun gun to see if Selma would move, but she did not.

Rosa was in shock. She telephoned her mother but did not reach her until about 3:00 p.m. Rosa also tried to call her pastor but got only his voicemail. Rosa wrapped Selma's body in sheets and then moved it by herself to the shed in the backyard by using boards to place the body onto a dolly. Rosa put the body into the garbage in the shed and padlocked the door. The key to the padlock was found on Rosa's utility belt. Rosa

15

decided to wait until Eric got home to see if she could convince him to let Mei take care of Elizabeth.

Rosa testified that when Mei arrived at Selma's house around 5:25 p.m., Rosa met her at the side entrance, but did not tell her what had happened to Selma. Rosa told her mother that she needed her to watch Elizabeth while Rosa tried to talk to Eric about custody. When Eric arrived, Rosa was upstairs. She heard him talking to her mother. Rosa testified that, when she came out of the bathroom into the hallway, Eric charged her. She was scared and tased him, but it had no effect. He grabbed Rosa and started banging her head into the floor. Mei tried to pull him off of Rosa, and Rosa was able to reach the stun gun and stun him. Eric grabbed the baton and hit Mei in the head with it. Rosa testified that at some point Eric had a gun.

At that point, Elizabeth ran into the hallway, and Rosa picked her up, moved her to the far corner of the bathroom, and closed the door. As the struggle continued, Rosa tried to talk to Eric about having Elizabeth stay with her mother, but she was distracted by the sound of sirens.

Rosa testified that she did not go to the house with the intention of killing Selma or Eric. She gave a statement to the police that night because the officers told her that if she did not talk to them, she would never see Elizabeth again. Rosa told the police that Mei had tased Eric. She admitted at trial that not everything she told the police was true.

On June 28, 2011, the jury convicted both Rosa and Mei of one count of first degree murder and one count of premeditated attempted murder. The jury also convicted Mei of one count of first degree burglary. The jury found the firearm enhancement allegations were true as to Rosa but not true as to Mei.

On August 29, 2011, the trial court sentenced Rosa to consecutive prison terms of 25 years to life plus one year on count one and life with the possibility of parole plus 10 years on count two. The court sentenced Mei to consecutive terms of 25 years to life on count one and life with the possibility of parole on count two, and stayed a four-year sentence on count three. Appellants filed timely notices of appeal.

16

# III.    DISCUSSION

A. *Whether The Prosecutor Gave Adequate Notice Of A Felony Murder Theory*

Mei contends that neither she nor Rosa was given constitutionally adequate notice that the prosecutor would pursue a felony-murder theory.

1. *Background*

In the amended complaint filed on August 17, 2009, the Alameda County District Attorney charged Rosa and Mei with murder with malice aforethought in violation of section 187, subdivision (a), and alleged the special circumstance that they killed the victim in the course of a burglary within the meaning of section 190.2, subdivision (a)(17).  At the conclusion of the preliminary hearing and a lengthy discussion with counsel, the magistrate declined to hold either Rosa or Mei to answer on the special circumstance allegation.  The court stated, "I do believe there's probable cause to believe that [Rosa is] guilty of a burglary . . . .  [¶]  And I think I've made clear why I think that alone does not establish the specials, but I'm not saying that there isn't probable cause on that point."

The prosecutor subsequently filed an information that again alleged a felony-murder special circumstance, that Rosa had killed the victim in the course of a burglary within the meaning of section 190.2, subdivision (a)(17).  On March 5, 2010, the court granted Rosa's section 995 motion to set aside the special circumstance allegation.

At the end of trial, the prosecutor requested instructions on the first degree felony-murder theory of murder, based on an unlawful killing that occurred during the commission or attempted commission of the crime of burglary and/or kidnapping.  Rosa's counsel objected to the giving of any instructions on felony murder or kidnapping, on the grounds "there was no notice in the accusatory pleadings that the DA was going to rely on a felony murder rule," and the magistrate had found no evidence of kidnapping at the preliminary hearing.

The prosecutor acknowledged that the magistrate had found insufficient evidence to hold Rosa and Mei to answer on special circumstance allegations at the preliminary hearing, but argued that this ruling had no bearing on theories of murder for submission

to the jury. The trial court agreed with the prosecutor: "What we are talking about is theories of liability. And the fact that there was insufficient evidence presented at a preliminary hearing to establish any basis for a special circumstance count of kidnapping is a far different thing from what we are dealing with here." The court found there was "ample evidence of the underlying felonies [i.e., kidnapping and/or child abduction] that would constitute the burglary allegation for felony murder."

The trial court instructed the jury pursuant to CALJIC Nos. 8.21, 8.26 and 8.27 on first degree felony murder as a theory of murder, i.e., an unlawful killing committed in the perpetration of, or attempt to perpetrate, certain enumerated felonies including, as alleged here, burglary and kidnapping. The court's burglary instruction pursuant to CALJIC No. 14.50 specified kidnapping and/or child abduction as the underlying felonies: "Every person who enters any building with the specific intent to commit kidnapping and/or child abduction, a felony[,] is guilty of the crime of burglary in violation of Penal Code section 459." The court also instructed on the substantive offenses of kidnapping and child abduction pursuant to CALJIC Nos. 9.50, 9.57 and 9.71.

2. *Legal Principles*

Our Supreme Court has explained that, although there are different theories of murder with different elements, there is only one statutory offense of murder. (*People v. Nakahara* (2003) 30 Cal.4th 705, 712.) " '[I]f the charging document charges the offense in the language of the statute defining murder (§ 187), the offense charged includes murder in the first degree and murder in the second degree.' " (*People v. Taylor* (2010) 48 Cal.4th 574, 625.) Similarly, "[f]elony murder and premeditated murder are not distinct crimes, and need not be separately pleaded." (*People v. Nakahara*, *supra*, 30 Cal.4th at p. 712.) Thus, a pleading charging murder under Penal Code section 187, subdivision (a), "provides adequate notice that the defendant might be convicted of first degree murder on a felony-murder theory." (*People v. Abel* (2012) 53 Cal.4th 891, 937; see also *People v. Kipp* (2001) 26 Cal.4th 1100, 1131; *People v. Gallego* (1990) 52 Cal.3d 115, 188.)

18

3. *Analysis*

Appellants contend they did not receive adequate notice of a felony-murder theory because it was not specifically pleaded and the felony-murder special circumstance allegation was stricken before trial. Mei contends that she and Rosa "were led to believe that the prosecution would not be proceeding under a felony murder theory," and that the "lack of notice deprived [her] of . . . a reasonable opportunity to defend such a theory."

As an initial matter, the claim fails because the issue was not preserved for appeal. Mei neither requested a continuance to address the claimed lack of sufficient notice of the felony-murder theory nor moved to reopen the taking of evidence so as to present a defense against the felony-murder theory. (See *People v. Gurule* (2002) 28 Cal.4th 557, 602, 603; *People v. Kipp*, *supra*, 26 Cal.4th at pp. 1131-1132; *People v. Memro* (1995) 11 Cal.4th 786, 869, overruled on another ground in *People v. Gaines* (2009) 46 Cal.4th 172, 181, fn. 2.)

The contention also fails on the merits. The information charged murder pursuant to Penal Code section 187, subdivision (a). "A pleading referring only to Penal Code section 187, subdivision (a) provides adequate notice that the defendant might be convicted of first degree murder on a felony-murder theory." (*People v. Abel*, *supra*, 53 Cal.4th at p. 937, citing *People v. Kipp*, *supra*, 26 Cal.4th at p. 1131.) The information also charged Mei with residential burglary, providing further notice of a potential felony-murder theory. Moreover, the magistrate's refusal to hold appellants on a felony-murder special circumstance was based on the evidence presented at the preliminary hearing and the magistrate's finding of probable cause that murder, not kidnapping, was the felony appellants intended upon entry into Selma's house. By contrast, the trial court heard evidence in the case "for close to three months," including evidence that appellants "pondered the issue as to custody and how to regain control of the baby," before deciding to instruct on the felony-murder theory of murder. The dismissal of the special circumstance allegation did not deprive appellants of notice of, or bar the prosecution from pursuing, a felony-murder theory of murder.

19

Mei's reliance on *Sheppard v. Rees* (9th Cir. 1989) 909 F.2d 1234 (*Sheppard*) is misplaced. First, federal cases are not binding on this court. (*People v. Williams* (1997) 16 Cal.4th 153, 190 [decisions of lower federal courts interpreting federal law are not binding on state courts]; *People v. Crittenden* (1994) 9 Cal.4th 83, 120, fn. 3 [decisions of lower federal courts are not binding, even on federal questions].) Moreover, and as we have previously determined (see *People v. Crawford* (1990) 224 Cal.App.3d 1, 7-9), that case is readily distinguishable on its highly unusual facts.

In *Sheppard*, the defendant was charged with murder, and the trial proceeded on a theory that the killing was premeditated and deliberate. No felony-murder theory or robbery charges, upon which a felony-murder theory could be based, arose, either "directly or indirectly," during pretrial or trial proceedings. After both sides had rested and jury instructions had been settled, the prosecutor raised for the first time the theory of felony murder with a predicate offense of robbery, and requested and obtained an instruction applicable to this new theory. (*Sheppard*, *supra*, 909 F.2d at p. 1235.) The prosecutor argued that theory and the defendant was convicted of first degree murder. (*Id*. at pp. 1235-1236.) During the course of the defendant's federal habeas petition, the state defended its practice of murder pleading, but *conceded* that " 'a pattern of government conduct affirmatively misled the defendant, denying him an effective opportunity to prepare a defense' " against the felony-murder charge. (*Id*. at p. 1236, italics omitted.) The state in fact admitted that the " ' "defendant was ambushed." ' " (*Ibid*.) The Ninth Circuit concluded that the defendant's Sixth Amendment right to notice of the charges against him had been violated, and granted the habeas petition. (*Id*. at pp. 1237-1238.)

Unlike *Sheppard*, here the prosecutor repeatedly attempted to charge a felony-murder special circumstance and charged a separate felony, burglary, as count three in the information. The prosecutor persistently argued, and the record is replete with references to, the theory that appellants intended to take the child, that is, kidnapping and/or child abduction as the target offenses of burglary. Under these circumstances,

appellants could not have been misled and suffered no violation of their right to notice of the charges.

B. *Whether The Trial Court Erred By Instructing The Jury That Felony Murder Could Be Based On Uncharged Felonies*

Mei contends the trial court erred by instructing the jury that felony murder could be based on the uncharged felonies of kidnapping or child abduction. Noting that the only felony (other than murder and attempted murder) charged in the information or amended information was burglary, Mei argues, "to the extent the jury relied on the felony murder doctrine to convict for first degree murder, the jury could only convict the defendants on a burglary theory of felony murder."

The contention has no merit. There is no requirement that an information must charge the underlying offense for a felony-murder theory. As our Supreme Court has stated, "it has long been the law in this state that an accusatory pleading charging murder need not specify degree or the manner in which the murder was committed. [Citations.] Thus, even where the People intend to rely on a felony-murder theory, the underlying felony need not be pleaded in the information." (*People v. Thomas* (1987) 43 Cal.3d 818, 829, fn. 5.)

*People v. Tully* (2012) 54 Cal.4th 952, 1024 (*Tully*), upon which Mei relies, is not to the contrary. Mei contends that, in *Tully*, "the California Supreme Court suggested that *Apprendi*'s[8] requirement that any fact that increases the maximum penalty for a crime, other than a prior conviction, be formally charged, submitted to the fact finder, treated as a criminal element, and proved beyond a reasonable doubt might require that the underlying felony for felony murder be actually charged in the information." We find no such suggestion by the court in *Tully*; rather this was one of the defendant's contentions. In rejecting the argument that *Apprendi* required the jury to unanimously agree on the theory of murder and which of two possible target offenses (theft or rape) supported the burglary-murder theory of first degree murder, the court stated: "We have previously rejected these arguments and do so again. [¶] '[A]though the two forms of

---

[8] *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*).

murder have different elements, only a single statutory offense of murder exists. Felony murder and premeditated murder are not distinct crimes, and need not be separately pleaded. [Citations.] As for defendant's claim that a unanimity instruction should have been given, our cases have repeatedly rejected this contention, holding that the jurors need not unanimously agree on a theory of first degree murder as either felony murder or murder with premeditation and deliberation. [Citations.] [¶] We are not persuaded otherwise by *Apprendi v. New Jersey* [, *supra*,] 530 U.S. 466. There, the United States Supreme Court found a constitutional requirement that any *fact* that increases the maximum penalty for a crime, other than a prior conviction, must be formally charged, submitted to the fact finder, treated as a criminal element, and proved beyond a reasonable doubt. [Citation.] We see nothing in *Apprendi* that would require a unanimous jury verdict as to the particular *theory* justifying a finding of first degree murder. (See also *Ring v. Arizona* (2002) 536 U.S. 584, 610 [requiring jury finding beyond reasonable doubt as to *facts* essential to punishment].)' (*People v. Nakahara*, *supra*, 30 Cal.4th at pp. 712-713, original italics; see *People v. Taylor*, *supra*, 48 Cal.4th at p. 626 [rejecting contention that for purposes of felony murder the jury must unanimously agree on the target offense].)" (*Tully*, *supra*, 54 Cal.4th at pp. 1023-1024.) We discern nothing in *Tully* that supports Mei's argument for new charging requirements for felony murder.

To the extent Mei argues that the jury was not required to determine beyond a reasonable doubt that a defendant committed or attempted to commit the uncharged underlying felonies of kidnapping or child abduction, the contention is belied by the jury instructions.

Moreover, as with her prior argument regarding inadequate notice of a felony-murder theory, to the extent that Mei claims she was surprised by the prosecution's felony-murder theory based on kidnapping or child abduction, her failure to move for a continuance or to reopen the taking of evidence to present a defense against it waives the claim. (*People v. Kipp*, *supra*, 26 Cal.4th at pp. 1131-1132; *People v. Memro*, *supra*, 11 Cal.4th at p. 869.)

22

C. *Whether The Trial Court Correctly Instructed On Aider And Abettor Liability For Felony Murder*

Mei contends the trial court erred in failing to instruct the jury that she could not be guilty of felony murder if she did not aid and abet the burglary or kidnapping until after Selma was already dead.[9]  Respondent argues that the instructions were in fact correct; the evidence did not support such an instruction; and Mei waived any such instruction by failing to request it.

Here, the trial court instructed the jury on general principles pertaining to felony murder and aiding and abetting.[10]  Specifically, the trial court instructed on first degree felony murder pursuant to CALJIC No. 8.21 as follows:  "The unlawful killing of a human being, whether intentional, unintentional or accident, which occurs during the commission or attempted commission of the crime of kidnapping and/or burglary is also murder of the first degree when the perpetrator had the specific intent to commit that crime.  [¶]  The specific intent to commit kidnapping and/or burglary and the commission or attempted commission of that crime must be proved beyond a reasonable doubt."  The trial court instructed on aider and abettor liability for felony murder pursuant to CALJIC No. 8.27:  "If a human being is killed by any one of several persons engaged in the commission or attempted commission of the crime of kidnapping and/or burglary, all persons, who either directly and actively commit the act constituting that crime, or who with knowledge of the unlawful purpose of the perpetrator of the crime and with the intent or purpose of committing, encouraging, or facilitating the commission of the offense, aid, promote, encourage, or instigate by act or advice its commission, are guilty

---

[9] Regarding the allegations against Mei, the prosecution charged her in count three with burglary based presumably on her own entry into Selma's house.  On the murder charge, count one, however, the prosecution proceeded inter alia on the felony-murder theory that Mei was an accomplice to Rosa's uncharged burglary (the earlier entry into Selma's house) or uncharged kidnapping.

[10] The trial court also instructed the jury on conspiracy as a theory of liability.  Mei does not challenge the conspiracy instructions; thus, we need not address them here.

23

of the murder [*sic*] of the first degree, whether the killing is intentional, unintentional, or accidental."

Mei argues that the court should have instructed the jury with the third, optional paragraph of CALJIC No. 8.27, which provides: "[In order to be guilty of murder, as an aider and abettor to a felony murder, the accused and the killer must have been jointly engaged in the commission of the (felony)_____ at the time the fatal [blow was struck] [wound was inflicted].]" (CALJIC No. 8.27.)

This provision is derived from *People v. Pulido* (1997) 15 Cal.4th 713 (*Pulido*), which addressed the "scope of complicity" in felony murder, framing the question presented thusly: "If one person, acting alone, kills in the perpetration of a robbery, and another person *thereafter* aids and abets the robber in the asportation and securing of the property taken, is the second person guilty of first degree murder under section 189?" (*Id.* at p. 716.) The court answered the question in the negative, explaining that the second person is an accomplice to robbery but is not liable for the murder "because the killer and accomplice were not 'jointly engaged at the time of such killing' in a robbery [citation]; the killer, in other words, was not acting, at the time of the killing, in furtherance of a 'common' design to rob." (*Ibid.*)

*Pulido* involved a defendant who testified that he and the codefendant were driving around, stopped at a gas station, and the codefendant went inside while the defendant waited in the car. Upon hearing a gunshot, the defendant ran into the store and saw the codefendant with a gun and the gas station employee's body on the floor. The defendant went back to the car; the codefendant followed, carrying a cash register which he dumped on the defendant's lap. As they drove away, at the codefendant's direction, the defendant pried open the register, gave the money to the codefendant, and discarded the register by the side of the road. (*Pulido*, *supra*, 15 Cal.4th at p. 718.) The court concluded that aiders and abettors who join a felonious enterprise only after a killing has taken place, so-called "late joiners," are not liable for the earlier homicide. (*Id.* at pp. 725-726.)

24

In *Pulido*, the Supreme Court did not reach the issue of whether the trial court had a sua sponte duty to instruct regarding a late-joining accomplice because the defendant could not demonstrate prejudice from the asserted error. (*Pulido*, *supra*, 15 Cal.4th at p. 726.) The factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under another instruction, the robbery-murder special-circumstance instruction. (*Ibid*.) By returning a true finding on the special circumstance allegation, the jury necessarily found the defendant was engaged in the robbery at the time of the killing. (*Id*. at pp. 726-727.)

To provide guidance in future cases, however, the *Pulido* court discussed the standard jury instructions in the context of robbery as the underlying felony: "These standard instructions are correct in general; when, however, substantial evidence would permit the jury to find the defendant began aiding and abetting an enumerated felony only after the killing occurred, they may require modification, or qualification with a special instruction. Unmodified, CALJIC No. 8.27 appears to tell the jury that an aider and abettor in an enumerated felony, without any temporal or causal qualification, is liable for first degree murder in a killing committed by anyone else engaged in the felony. In combination with [CALJIC No. 9.40.1, concerning the duration of a robbery], CALJIC No. 8.27 could well suggest to a jury that a person who aids and abets only in the asportation phase of robbery, after the killing is complete, is nonetheless guilty of first degree murder under the felony-murder rule. As we have seen, that implication would be incorrect." (*Pulido*, *supra*, 15 Cal.4th at p. 728.)

Mei argues the trial court erred in failing to instruct the jury pursuant to paragraph three of CALJIC No. 8.27, the "complicity instruction," because, without that point of clarification, the jury could have found Mei guilty of felony murder even if she did not aid and abet any underlying felony committed by Rosa until after Rosa killed Selma.

Respondent contends that Mei was not entitled to the complicity instruction because it was not supported by the evidence. Respondent relies on the use note to CALJIC No. 8.27, which provides that the complicity instruction "should only be given if a defendant contends he or she did not aid and abet until after the fatal blow was

25

stricken." (Use Note to CALJIC No. 8.27 (Spring 2013 ed.) p. 587, citing *Pulido*, *supra*, 15 Cal.4th 713.) Respondent points out that this was not Mei's theory at trial. Rather, in her testimony, Rosa repeatedly distanced Mei from any involvement and insisted that Mei knew nothing other than that Rosa wanted her to watch Elizabeth so she could talk to Eric. Mei's counsel argued to the jury that Mei only struck Eric when she saw him attacking her daughter. Presumably in reliance on the use note, Mei asserts multiple times in her briefs that she did not aid and abet Rosa until after Rosa killed Selma, and that this was her theory at trial.

The parties' focus on appellants' theory at trial is misplaced. Although the use note bases applicability of the instruction on a defendant's *contentions* at trial, our reading of *Pulido* indicates that the court was focused, rather, on whether *substantial evidence* could support a jury finding. Regardless of appellants' contentions at trial, there was substantial evidence from which one or more jurors could conclude that Mei was not present when Rosa killed Selma and that Mei's "joint engagement" in the commission of burglary and/or kidnapping did not arise until after Selma was already dead. There was evidence that Rosa arrived at Selma's house early that morning, that Selma was killed early in the day, and that Mei did not arrive at Selma's house until after 5:00 p.m. for the purpose of watching the child so Rosa could talk to Eric.[11]

A similar situation was present in *Pulido*, where the defendant claimed he participated in the robbery only under duress or after reaching a place of temporary safety, not that he intentionally assisted in the robbery only after the killing. (*Pulido*, *supra*, 15 Cal.4th at p. 726.) Nowhere in *Pulido* does the court base its conclusion on the defendant's contentions or theory at trial, as opposed to substantial evidence from which the jury could conclude that he was a "late joiner." (See *id*. at pp. 726-728 [noting that

---

[11] There was also evidence that would have supported the opposite finding—that Mei knew of and participated in Rosa's plans prior to the commission of the murder and was "jointly engaged" in the scheme throughout. But it was up to the jury to make that determination which, in the absence of the *Pulido* instruction, i.e., paragraph three of CALJIC No. 8.27, it was prevented from making.

when "substantial evidence would permit the jury to find the defendant began aiding and abetting an enumerated felony only after the killing occurred," the standard jury instructions may require modification].) We suggest the use note to CALJIC No. 8.27 could more precisely articulate this point.

Respondent argues that, even if the instruction could properly have been given, it merely pinpoints a theory of the defense and Mei waived the instruction by failing to request it. Mei acknowledges that she did not request the instruction; she contends the trial court had a sua sponte duty to give it.

In criminal cases, a trial court must instruct sua sponte on the " ' "general principles of law relevant to the issues raised by the evidence," ' " that is, those principles " ' "closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." ' " (*People v. Breverman* (1998) 19 Cal.4th 142, 154.) By contrast, " 'pinpoint' " instructions "relate particular facts to a legal issue in the case or 'pinpoint' the crux of a defendant's case, such as mistaken identification or alibi. [Citation.] They are required to be given upon request when there is evidence supportive of the theory, but they are not required to be given sua sponte." (*People v. Saille* (1991) 54 Cal.3d 1103, 1119.)

As noted previously, the *Pulido* court did not decide whether the trial court had a sua sponte duty to instruct regarding the timing of an accomplice's participation in the underlying felony relative to the killing because the special circumstance finding necessarily resolved the issue against the defendant. (*Pulido*, *supra*, 15 Cal.4th at pp. 726-727.) However, the *Pulido* court's statement that the evidence "may require" such an instruction, albeit dicta, certainly suggests that a sua sponte duty could exist, depending on the evidence. (*Id.* at p. 728.) Here, the special circumstance allegation was stricken after the preliminary hearing, and there is no argument that any other instructions given to the jury supplied the missing finding regarding the timing of Mei's participation in the underlying felony.

The only case we have found that holds a trial court has a sua sponte duty to instruct on this issue is *People v. Esquivel* (1994) 28 Cal.App.4th 1386 (*Esquivel*), which

predates *Pulido*. In *Esquivel*, the defendant was convicted of felony murder based on his participation in the underlying robbery as an aider and abettor. (*Id*. at pp. 1389, 1393-1394.) Esquivel and two other men were at the home of an acquaintance when one of the men attacked and killed the acquaintance. Various items of personal property were stolen from the acquaintance's home, including guns that were found at the defendant Esquivel's home. (*Id*. at pp. 1390-1391.) Esquivel argued on appeal that the trial court "erred in failing to instruct the jury sua sponte that if [he] became an aider and abettor to a robbery after the victim had already been fatally wounded, he could not be found guilty of felony murder." (*Id*. at p. 1392.) The Court of Appeal agreed and reversed his conviction, holding Esquivel could not be liable for murder under a felony-murder theory if he formed the intent to aid and abet the robbery after the murder was committed and the jury should have been instructed accordingly. (*Id*. at pp. 1396, 1401.)

The *Esquivel* court also held that the trial court had a sua sponte duty to instruct on the timing of his intent to participate in the underlying felony. (*Esquivel*, *supra*, 28 Cal.App.4th at pp. 1398-1399.) Analogizing to the law of conspiracy, *Esquivel* relied on *People v. Marks* (1988) 45 Cal.3d 1335, in which the court stated, " 'A conspirator cannot be held liable for a substantive offense committed pursuant to the conspiracy if the offense was committed *before* he joined the conspiracy. [Citations.] The trial court, however, did not instruct the jury that it must find defendant joined the conspiracy before the murder. A trial court has a sua sponte duty to instruct on the general principles of law relevant to the issues raised by the evidence. [Citation.] There was evidence suggesting that defendant did not join the alleged conspiracy until after the murder.' " (*Esquivel*, *supra*, 28 Cal.App.4th at pp. 1398-1399, quoting *People v. Marks*, *supra*, 45 Cal.3d at p. 1345.) The *Esquivel* court also found that no instruction informed the jury that Esquivel, as an aider and abettor, had to have formed the intent to participate in the robbery before the murder was committed in order to be found guilty of felony murder. This amounted to a failure to adequately inform the jury of the relevant legal principles, as to which the trial court had a sua sponte duty to instruct. (*Esquivel*, *supra*, 28 Cal.App.4th at p. 1399.)

28

Our Supreme Court's recent case of *People v. Wilkins* (2013) 56 Cal.4th 333 (*Wilkins*) also bears on whether the trial court in this case had a sua sponte duty to instruct regarding the timing of Mei's participation in the underlying felony for felony-murder liability. In *Wilkins*, the defendant burglarized a home under construction, stole several large appliances, and drove away with them in the bed of a pickup truck. (*Id*. at p. 338.) As he was driving, a stove fell off the truck onto the freeway. Another driver alerted the defendant, but he left it on the freeway and continued to drive. (*Id*. at pp. 338-339.) Subsequently, another motorist swerved to avoid the stove, crashed his vehicle, and was killed. (*Id*. at p. 339.) The defendant was convicted of first degree murder on the felony-murder theory that the motorist's death occurred in the commission of a burglary. (*Id*. at p. 340.)

At trial, defense counsel requested an instruction that, for purposes of felony murder, the burglary continues until the perpetrator reaches a place of temporary safety, also known as the "escape rule." The trial court refused the instruction, and the Court of Appeal affirmed. (*Wilkins*, *supra*, 56 Cal.4th at pp. 337-338, 341.) The California Supreme Court, however, reversed, based on its determination that the defendant's requested instruction was legally correct and supported by substantial evidence, i.e., evidence that the defendant was 62 miles from the scene of the burglary when the stove fell off his truck, he had been driving for about an hour, and there was no evidence that anyone was following him or was even aware yet of the burglary. Thus, the jury could have concluded that the defendant had reached a place of temporary safety before the fatal collision occurred, in which case the murder did not occur *while the killer was engaged in* the felony. (*Id*. at pp. 347-348.) The critical inquiry for applicability of the felony-murder rule, the court explained, is "whether the murder was 'committed *in the perpetration of*' the felony. (Pen. Code, § 189, italics added.)" (*Id*. at p. 346.)

The parties in *Wilkins* disagreed on whether the failure to instruct on the escape rule amounted to misinstruction on an element of the offense, in which case the federal harmless error standard applied, or a refusal to give a pinpoint instruction, a state law error. (*Wilkins*, *supra*, 56 Cal.4th at pp. 348-349.) The *Wilkins* court concluded that the

federal harmless error standard applied because the instruction the trial court gave "was—in absence of an instruction on the escape rule—incomplete and misleading." (*Id.* at p. 349.) The court explained: "[T]he jury was told that it could consider '[w]hether the fatal act occurred while the perpetrator was fleeing from the scene of the felony or otherwise trying to prevent the discovery or reporting of the crime.' Nothing in the instruction, however, informed the jury that there was any rule it must apply in determining whether the felony and the fatal act were part of one continuous transaction or in determining whether defendant's flight had ended. . . . Under these instructions, even a juror who believed that defendant had reached a place of temporary safety before the fatal act occurred would have no reason to conclude that he or she must find the defendant not guilty of first degree murder. The instructions given, therefore, amounted to misinstruction on an element of the offense of first degree murder. Accordingly, the federal harmless error standard applies." (*Id.* at pp. 349-350, fn. omitted.)

In the instant case, the instruction the trial court gave on the scope of aider and abettor liability for felony murder was incomplete and misleading in the same way the instruction in *Wilkins* was incomplete and misleading. Here, in the context of evidence that Mei, an alleged aider and abettor, was not present at the scene when the victim was killed, but arrived later, the instruction failed to advise the jury that, to be liable for felony murder Mei must have been jointly engaged in the commission or attempted commission of the underlying burglary and/or kidnapping at the time the fatal blow was dealt. (See *Pulido*, *supra*, 15 Cal.4th at p. 729; CALJIC No. 8.27.) The instructions that were given provided no guidance to the jury on the timing of Mei's aiding, promotion, encouragement or instigation by act or advice, of Rosa's commission of the burglary and/or kidnapping. (See *Esquivel*, *supra*, 28 Cal.App.4th at pp. 1398-1399.) Under the instructions as given, a juror who believed that Mei's aiding and abetting the burglary and/or kidnapping began after Selma was already dead, such as when Mei arrived at Selma's house, "would have no reason to conclude that he or she must find [Mei] not guilty of felony murder." (See *Wilkins*, *supra*, 56 Cal.4th at pp. 349-350.) Thus, the trial court here had a sua sponte duty to instruct the jury that felony-murder liability does not

30

attach to a defendant who aids and abets the perpetrator of the crime only after the killing.  (See *Pulido*, *supra*, 15 Cal.4th at pp.726, 729.)

Not surprisingly, the parties disagree about the effect of an instructional error here. Mei contends the federal harmless error standard applies because the error amounts to misinstruction on an element of the offense.  She further contends that the standard is not met and reversal is required.  Respondent argues, assuming error, it was harmless under any standard based on "overwhelming evidence" that Rosa and Mei acted together in planning and preparing to commit the felony that resulted in Selma's death.  Respondent also argues that the evidence overwhelmingly supported a conviction under a theory of premeditated malice murder based on the evidence of computer searches for poisons, other methods of killing, and how to get away with murder as well as evidence of their actions on the day of Selma's death.

We agree with Mei that the federal harmless error standard applies here.  A trial court's misinstruction on an element of an offense is subject to federal harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18.  (*Wilkins*, *supra*, 56 Cal.4th at pp. 348-350; *People v. Flood* (1998) 18 Cal.4th 470, 503-504; *Esquivel*, *supra*, 28 Cal.App.4th at p. 1399.)  "Instructional error regarding the elements of the offense requires reversal of the judgment unless the reviewing court concludes beyond a reasonable doubt that the error did not contribute to the verdict."  (*People v. Chun* (2009) 45 Cal.4th 1172, 1201; *People v. Flood*, *supra*, 18 Cal.4th at p. 504.)  The inquiry "is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error."  (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279.)  Phrased another way, the error is harmless only "if other aspects of the verdict or the evidence leave no reasonable doubt that the jury made the findings necessary" for a valid first-degree murder theory.  (*People v. Chun*, *supra*, 45 Cal.4th at p. 1205.)

Here, under the instructions given, the jury could have convicted Mei of first degree murder on a felony-murder theory either on the inference that she aided and abetted Rosa's burglary and/or kidnap at the time Selma was killed or on the inference

31

she began aiding and abetting Rosa after Selma was killed.[12]  The instructions did not require the jury to decide whether Mei was aiding and abetting *at the time of Selma's death*; no other aspects of the verdict or the evidence eliminate reasonable doubt that the jury made that necessary finding.  (See *People v. Chun*, *supra*, 45 Cal.4th at pp. 1204-1205.)  Although the jury clearly disbelieved appellants' theory that Mei knew nothing and was completely uninvolved upon entering Selma's house, as evidenced by the jury's separate burglary verdict against Mei, the jury nevertheless could have believed that Mei's involvement did not constitute aiding and abetting until after Selma was killed.  On this record, we are unable to conclude beyond a reasonable doubt that the error did not contribute to the verdict.  (See *id.* at p. 1201.)  Thus, the error was prejudicial.

Our determination that Mei's murder conviction must be reversed renders it unnecessary for us to consider her other claims of instructional error regarding the murder charge.

D. *Rosa's Statement*

Rosa contends the trial court erred in admitting her post-arrest statement for impeachment purposes at trial.  She argues that the statement was involuntary and should have been suppressed for all purposes.

1. *Background*

Several hours after her arrest, shortly after 12:00 a.m. on January 8, 2009, Rosa was interviewed by two deputies of the Alameda County Sheriff's Department at a police station in Dublin.  Before the interview, Rosa did not express any physical discomfort; she declined the deputies' offer of food or water or to use the restroom.  The interview was videotaped.

The deputies advised Rosa of her *Miranda*[13] rights.  The advisement took some time, as Rosa expressed doubt about understanding her rights, asked questions, such as whether requesting a lawyer would "delay the process," expressed concern about her

---

[12] The jury was also instructed on conspiracy principles and first degree murder as a "willful, deliberate and premeditated killing with express malice aforethought."

[13] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

ability to express herself, and stated that she had "very little understanding" about the legal process. The deputies discouraged her from requesting an attorney by telling her an attorney would prevent her from speaking with them, suggesting or implying that her only opportunity to tell her story was to waive her rights. In response to Rosa's saying, "if I choose to remain silent and my side of the story wouldn't be told," one of the deputies responded, "Exactly." Rosa indicated that she did not understand the role of an attorney and, after stating they could not give legal advice and that an attorney would prevent her from speaking with them, the same deputy told Rosa, "you were found with a gun in your pocket" and "I think you should explain." The deputy further stated, "[Y]ou have some explaining to do. [¶] . . . [¶] [Y]ou either explain it to us now . . . [¶] . . . or we go to trial and—and you sit there and you let the jury wonder what really happened because you didn't say anything." After an extended colloquy, Rosa agreed to speak with them.

Rosa told the deputies she took BART and then a cab to Selma's house in order to talk to Eric about the child. She called and asked her mother to meet her there. When Rosa arrived, the door was open but no one was home. Mei came after work, and she and Rosa went into the house. Eric came home shortly thereafter with the baby, and Rosa tried to talk to him. He went "berserk" and attacked her, banging her head on the floor, which was when her mother "came to me and tried to help me." Eric had a gun in his hand and Rosa was afraid he was going to shoot her. He dropped it during the struggle, and she picked it up and put it in her pocket. Mei shot Eric with a Taser to keep him from killing Rosa. Rosa denied any involvement in Selma's death.

On March 9, 2011, Rosa filed a motion to suppress her statement. She argued the deputies failed to give correct *Miranda* advisements. The trial court agreed that the deputies had misadvised Rosa, and found her waiver was not voluntary: "The matter being submitted, the Court is really very disturbed as to how this process went on. . . . [¶] . . . [¶] The biggest offender, and I think [defense counsel] hits it, is Detective Horn. Maybe it was a misstatement on his part where he makes a comment to the effect, well, unless you talk to us, your side of the story isn't going to be heard by the jury. If it were

33

an isolated incident and he later correctly set forth what the situation was or just stayed away from it, it wouldn't be so problematic because when you take this situation in light of the cases, you can break it down, as [the prosecutor] has done, to isolated parts and you can get—it isn't problematic, but here when you take a look at the totality of what is going on and the belittling of the role of the attorney as highlighted by Detective Horn's comment to the effect that, how can an attorney tell it better than you, especially if they are not there; I mean, attorneys generally are not at the crime scene. If they are, they are witnesses and they are not representing a party. And then it just goes on from there.

"It becomes extremely problematic and it does in many, many ways appear to undermine the very purpose of giving the *Miranda* warnings.

"So the Court finds that the totality of the circumstances are such that the Court is not satisfied that there was a voluntary waiver on the part of the defendant with regard to her rights under *Miranda*, that the statements of Detective Horn were extremely misleading with regard to the role of the attorney and down playing that role.

"There's certainly ways—artful ways in which some of these things could have been addressed, but the overall totality indicating that an attorney can't tell it better than you and the fact that you're not—your side isn't going to be heard, unless you speak with us, really does seem to negate *Miranda* and undermine it.

"Therefore, the Court will rule that there is a *Miranda* violation and the statement can't be used by the prosecution. However, the Court does note that should Ms. Hill choose to testify in this matter, then it is available for purposes of impeachment under the appropriate U.S. Supreme Court and California Supreme Court authorities."

Defense counsel objected to use of Rosa's statement for impeachment, arguing that the deputies' coercive conduct rendered the statement itself involuntary, and asked to brief that issue. The court, however, stated that it was "not a voluntariness issue," and did not find "anything here that constitutes necessarily any form of undue oppression."

The court ruled: "With regard to that request, the Court is denying your motion. The Court finds that you used the term 'coercive.' I don't necessarily find coercive. What I find is the fact that the police officers are required to give certain basic

information about one's rights; that wasn't done here. [¶] At the same point in time, I don't find your client to be one who is confused by the totality of the circumstances to the degree that her will is overborne and she doesn't really have a sense of what's going on or that she was sort of worn down. I don't find that. [¶] What I find is that the cops had a responsibility to give certain information and the law sets forth how they're supposed to do that and they failed that and they undermined that and that's why this statement is being kept out.

Before Rosa testified at trial, her counsel renewed the objection to the use of Rosa's statement for impeachment purposes. The trial court overruled the objection. During cross-examination, the prosecutor impeached Rosa with a number of her false statements, including that she took BART to Dublin on the day of the offense, that the door to Selma's house was open when she arrived, that Selma was not at home that day, and that Eric had a gun. When Rosa testified that Mei had not fired her Taser at Eric, the prosecutor impeached Rosa with her earlier statement to the contrary. Rosa acknowledged that she had tried to avoid incriminating herself to the deputies.

2. *Legal Principles*

In California, the admissibility of confessions is governed by federal law. (See Cal. Const., art. I, § 28, subd. (f)(2);[14] *People v. Peevy* (1998) 17 Cal.4th 1184, 1188.) In *Miranda*, the United States Supreme Court held that persons subject to custodial interrogation must be advised of certain Fifth Amendment rights, including the right to remain silent and the right to counsel, in order to protect the exercise of the privilege against self-incrimination. (*People v. Peevy*, *supra*, 17 Cal.4th at pp. 1191-1192.) Subsequently, the court held that statements obtained in violation of *Miranda* procedures may be admissible for impeachment purposes if the statements are voluntary. (*Oregon v. Hass* (1975) 420 U.S. 714, 722 [statement obtained after police fail to honor the accused's request for counsel is admissible for impeachment purposes]; *Harris v. New*

---

[14] Current section 28, subdivision (f)(2), was previously subdivision (d). The passage of Proposition 9 by the voters in 2008 amended section 28, resulting in some renumbering of previously existing subdivisions.

35

*York* (1971) 401 U.S. 222, 224, 226 [statement taken without advising the defendant of his right to appointed counsel may be admitted for impeachment].)  The court explained that the benefit to the jury of evaluating the defendant's credibility in light of prior inconsistent statements should not be lost, and that, assuming the exclusionary rule has the effect of deterring police misconduct, there was sufficient deterrence when the prosecution is barred from using the statements in its case in chief.  (*Oregon v. Hass*, *supra*, 420 U.S. at p. 722; *People v. Peevy*, *supra*, 17 Cal.4th at p. 1194.)

Here, the prosecution conceded that Rosa's statement was taken in violation of *Miranda* procedures and sought only to use the statement as impeachment evidence if Rosa took the stand.  Rosa argued that not only was her waiver of her rights involuntary in violation of *Miranda*, but also her statement itself was coerced and therefore involuntary.

Involuntary confessions are inadmissible under the due process clauses of both the federal and state constitutions.  (*Jackson v. Denno* (1964) 378 U.S. 368, 385-386; *People v. Benson* (1990) 52 Cal.3d 754, 778 (*Benson*).)  The prohibition is based on the "inherent untrustworthiness" of involuntary confessions, as well as on "the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves." (*Spano v. New York* (1959) 360 U.S. 315, 320-321.)  In general, a statement is voluntary "if the accused's decision to speak is entirely . . . without 'any form of compulsion or promise of reward.' " (*People v. Thompson* (1980) 27 Cal.3d 303, 327-328, disapproved on other grounds in *People v. Rowland* (1992) 4 Cal.4th 238, 260, and *People v. Scott* (2011) 52 Cal.4th 452, 470.)  Conversely, a statement is involuntary if it is not the product of " 'a rational intellect and a free will.' " (*Mincey v. Arizona* (1978) 437 U.S. 385, 398.)  Courts look to whether an individual's "will was overborne at the time he confessed." (*Lynumn v. Illinois* (1963) 372 U.S. 528, 534; *People v. Sanchez* (1969) 70 Cal.2d 562, 572.)  Thus, a confession is involuntary if it was obtained by threats or violence, or by any direct or implied promises, or by the exertion of improper influence.  (*Benson*, *supra*, 52 Cal.3d at p. 778, and cases

36

cited therein.)  Coercive police activity is a necessary predicate to a finding that a statement is involuntary.  (See *Colorado v. Connelly* (1986) 479 U.S. 157, 167; *Benson*, *supra*, 52 Cal.3d at p. 778.)

At trial, the prosecution has the burden to establish, by a preponderance of the evidence, that a defendant's confession was voluntary.  (*Lego v. Twomey* (1972) 404 U.S. 477, 489; *People v. Massie* (1998) 19 Cal.4th 550, 576.)  "Under both state and federal law, courts apply a 'totality of circumstances' test to determine the voluntariness of a confession.  [Citations.]  Among the factors to be considered are ' "the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity" as well as "the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health." ' (*People v. Williams* [(1997)] 16 Cal.4th [635,] 660.)"  (*People v. Massie*, *supra*, 19 Cal.4th at p. 576.)

On appeal, the reviewing court independently determines the voluntariness of a defendant's statement, but upholds the trial court's findings as to the factual circumstances, i.e., its " ' "resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence." ' "  (*People v. Sapp* (2003) 31 Cal.4th 240, 267; *Benson*, *supra*, 52 Cal.3d at p. 779; *People v. Memro*, *supra*, 11 Cal.4th at p. 826.)

3. *Analysis*

Rosa contends that her post-arrest statement was involuntary and thus inadmissible for any purpose, citing statements by the deputies she contends were misleading and circumstances she claims rendered the interrogation involuntary.  Rosa relies on portions of the interview after the deputies read her the *Miranda* advisements and while she was deciding whether to make a statement.  To provide context, we quote at length from the transcript, using italics to highlight the statements Rosa contends were improper.

[Detective Horn]:  "*And Rosa, you got—you have some explaining to do*.

[Rosa]:  "Yeah.

[Detective Horn]:  "I mean you either . . . .

[Rosa]:  "I want you to tell me . . . .

[Detective Horn]: " . . . *explain it—you either explain it to us now* . . . .

[Rosa]: "Mm-hm.

[Detective Horn]: " . . . *or we go to trial and—and you sit there and you let the jury wonder what really happened because you didn't say anything.* So, you know, that's my view on this. That's my personal opinion about this.

[Rosa]: "Mm-hm.

[Detective Horn]: "Is that I think that people should, you know, if they've done nothing wrong, it's my personal belief that they should tell me what happened. But we have— we're—we're—we're bound by the law and the law says that we must tell you what your rights are. And we just read those to you.

[Rosa]: "Okay.

[Detective Horn]: "You say you understand 'em so now the only decision is do you trust yourself enough to, um, be able to communicate effectively with us? And—and—and my sense is that you—yes you can.

[Rosa]: "And that's . . . .

[Detective Horn]: "You definitely can communicate. I'm quite sure you wrote some essays in college. So . . .

[Rosa]: "Well no topics like this.

[Detective Horn]: So but is—I mean, you know, from my perspective is that because you don't wanna talk about it because something—something was wrong with what you did or—or is it really because you're afraid that, you know, to communicate effectively.

[Detective Sanchez]: "Just question us there . . .

[Rosa]: "It's really about am I not communicate effectively?

[Detective Sanchez]: "Well the questions . . .

[Detective Horn]: "Not everybody's gonna interpret that way.

[Detective Sanchez]: "Yeah. The questions arise and—and other minds as far as to . . .

[Detective Horn]: "*So we—we really—we're talking way too much about this.*

[Detective Sanchez]: "Yeah.

[Detective Horn]: "*I—I need you to make a decision.*

[Rosa]: "I'll give it a try.

[Detective Horn]: "Okay. So, having your rights in mind, do you wish to speak to us now? Okay.

[Rosa]: "Sure.

[Detective Horn]: "So, and I'll take that. Now remember what I said. If at any point in time during this interview you feel uncomfortable, you need to say that's it, I don't wanna talk anymore. We stop. That's the neat thing about it. We just quit whenever you tell us to quit. Okay? All right. So let's . . . .

[Rosa]: "(Unintelligible) ask you one question.

[Detective Horn]: "Mm-hm. Sure.

[Rosa]: "Um, so after I tell you my side of the story, does this still go to court or how . . . .

[Detective Horn]: "*Well we're gonna submit this case to the district attorney's office.*

[Rosa]: "Mm-hm.

[Detective Horn]: "*And it'll be the district attorney's office decision on—on what to do. On whether or not they charge this case.*

[Rosa]: "Okay.

[Detective Horn]: "Okay?

[Detective Sanchez]: "Whether they file a complaint against you or anybody.

[Detective Horn]: "In the meantime, we're gonna hold you, you know, pending, you know, your—your day in court.

[Rosa]: "Okay.

[Detective Horn]: "Which you'll be arraigned within 48 hours.

[Rosa]: "(Unintelligible) okay.

[Detective Horn]: "Okay?

[Rosa]: "Mmm.

[Detective Horn]: "So, let's start at the beginning.

[Rosa]: "Okay."

Rosa first argues the deputies misled her by telling her this was her only chance to tell her story and explain the gun in her pocket; otherwise, at trial, the jury would "wonder what really happened because you didn't say anything." Then they pressed her to decide whether or not to give a statement. Although an "experienced suspect" would know she had a constitutional right to testify at trial, according to Rosa, the record reflects that she was "naïve about criminal proceedings." The deputies misled her again, Rosa contends, by "saying it was the district attorney's decision whether or not to charge the case … when they knew that, with a dead body found stuffed in a barrel and hidden in a backyard shed, there was no doubt whatsoever that she would be charged with murder."

Although improper under *Miranda*, the deputies' statements did not render Rosa's confession involuntary. True, Detective Horn's statements suggesting that this was Rosa's only chance to tell her side of the story were misleading regarding her right to testify at trial, and the trial court found a *Miranda* violation based in part on those statements. Under different circumstances, such interrogation techniques could be coercive and render the confession involuntary. (See, e.g., *Commonwealth v. Novo* (2004) 442 Mass. 262, 268-270 [holding confession involuntary where officers repeatedly warned murder defendant that the jury would never hear his side of the story if he did not make a statement to them], disapproved on another ground in *Commonwealth v. Thomas* (2014) 469 Mass. 531, 542.) Here, however, we agree with the trial court that, under the totality of the circumstances, Rosa's statement was voluntary. Although Rosa was concerned about being able to tell her story, the story she chose to tell was almost entirely fabricated, as she later testified. The trial court found "gamesmanship" during the interview by both Rosa and the deputies, which is supported by the record. The trial court noted that, on one hand, the officers realized they were dealing with "a well-educated woman who could comprehend what they were saying to her," and "did not have the great difficulty of communication . . . ." At the outset of the interview, the deputies indicated to Rosa that they had information about the case from speaking with other witnesses, but that they could not discuss the matter with her unless she wanted to talk with them. They later reiterated that if she requested an attorney, their interview

with her would be over.  Rosa, on the other hand, asked a number of questions, such as whether requesting an attorney would "delay the process," what was the role of an attorney, and whether, after making a statement, the matter would "still go to court."  She also expressed concern about her ability to "use the right words" and to communicate adequately.  In finding that her statement was voluntary, the court found, and we agree, that Rosa was not "confused by the totality of the circumstances to the degree that her will [was] overborne and she [did not] really have a sense of what's going on or that she was sort of worn down."

The deputies made no improper threats or promises of leniency.  Likewise, they used no coercive psychological ploys that would tend to produce an involuntary and untrue statement.  " 'The courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable.' " (*People v. Jones* (1998) 17 Cal.4th 279, 297-298.)  Moreover, "[i]t is well settled that 'mere advice or exhortation by the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary.' [Citation.]  . . .  [T]he distinction between permissible and impermissible police conduct 'does not depend upon the bare language of inducement but rather upon the nature of the benefit to be derived by the defendant if he speaks the truth as represented by the police.' [Citation.]  In terms of assessing inducements assertedly offered to a suspect, ' "[w]hen the benefit pointed out by the police . . . is merely that which flows naturally from a truthful and honest course of conduct," the subsequent statement will not be considered involuntarily made [citation].' " (*People v. Belmontes* (1988) 45 Cal.3d 744, 773, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421 & fn. 22.)  Here, the only benefit suggested by the deputies was the opportunity to explain what happened to both the deputies and the jury, a benefit that was free of any tendency to influence the truth or reliability of the statement.

Rosa argues that the police may not lie to a suspect about the law, but her reliance on *People v. Cahill* (1994) 22 Cal.App.4th 296 (*Cahill*) is misplaced.  In *Cahill*, the

officers told the defendant he could help himself and avoid a first-degree murder charge by admitting he was inside the victim's house and had knowledge of the killing to show the murder was not premeditated. (*Id.* at p. 314.) The officers also misled the defendant about the law by implying that the death penalty would not apply if the murder were not premeditated, with no mention of the felony-murder rule "and the consideration that a statement admitting defendant's presence in the house would amount to a confession of felony murder." (*Id.* at p. 315.) The court found the officers' interrogation tactics amounted to a threat or promise of leniency: "The clear implication of their remarks is that defendant would be tried for first degree murder *unless* he admitted that he was inside the house and denied that he had premeditated the killing." (*Id.* at p. 314.)

Rosa argues that this case is similar to *Cahill* in that, here, the officers falsely told her that this was her one chance to tell her side of the story and that she had to make her decision whether to talk then and there. Although we are somewhat troubled by the deputies' linking her right to testify at trial to invoking her *Miranda* rights, as we have discussed, in this case, unlike *Cahill*, there was no suggestion by the deputies that Rosa could avoid charges by giving a statement, nor any other false promise of leniency as inducement. Although she was misadvised as to her *Miranda* rights, she was not misled as to the substantive law.

Rosa's argument that the deputies misled her by telling her that the charging decision would be made by the district attorney is also without merit, for the simple reason that the deputies' statement was correct. "It is well settled that the prosecuting authorities, exercising executive functions, ordinarily have the sole discretion to determine whom to charge with public offenses and what charges to bring. [Citations.] This prosecutorial discretion to choose, for each particular case, the actual charges from among those potentially available arises from ' "the complex considerations necessary for the effective and efficient administration of law enforcement." ' " (*People v. Birks* (1998) 19 Cal.4th 108, 134.) Moreover, Rosa does not explain how the deputies' statements regarding the charging authority of the district attorney amounted to a threat or a promise of benefit or leniency as inducement to give a statement.

42

Finally, Rosa contends her statement was coerced because "the totality of the circumstances . . . resulted in an involuntary interrogation." Rosa points to the specific circumstances of her being taken in handcuffs first to the hospital to be examined for a head injury, then to the police station where she waited for about three hours before the interrogation began a few minutes after midnight.

The record does not support Rosa's claim of coercion. The delay between her arrest and interrogation was not coercive. The deputies took her to the hospital to be medically cleared before taking her to the police station. At the police station, Rosa had to wait because there was only one interview room with audiovisual equipment, and the police interviewed other witnesses first. There was food and water for Rosa on the table in the interview room, and the interview itself, the portion that is at issue, was brief, lasting approximately 14 minutes. Among the other factors courts consider in assessing the totality of the circumstances, such as the defendant's maturity, education, physical condition and mental health (*People v. Massie*, *supra*, 19 Cal.4th at p. 576), the record does not reflect that Rosa was "unduly distressed or subjected to any abusive or improper interrogation techniques." (See *People v. Hill* (1992) 3 Cal.4th 959, 981, disapproved on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1045, 1069, fn. 13.) At the time of the interview, Rosa was 34 years old, college-educated, and there is no indication that she was suffering from any physical or mental health conditions that would affect our analysis.

Ultimately, Rosa's claim of coercion fails because there is no indication in the record that her "will was overborne at the time [she] confessed." (*Lynumn v. Illinois*, *supra*, 372 U.S. at p. 534; *People v. Sanchez*, *supra*, 70 Cal.2d at p. 572.) Rosa acknowledged on the stand that she lied to the deputies in an attempt to avoid incriminating herself. Thus, her "own behavior and testimony virtually preclude[] a conclusion that [her] free will was overborne by the substance or manner of the interrogation." (*People v. Belmontes*, *supra*, 45 Cal.3d at p. 774.) The trial court did not err in admitting Rosa's statement for impeachment purposes.

43

E. *Prosecutorial Misconduct*

Rosa contends the prosecutor engaged in several instances of misconduct during cross-examination and closing arguments. Rosa argues the misconduct deprived her of her federal and state due process rights to a fair trial and an impartial jury.

" 'A prosecutor is held to a standard higher than that imposed on other attorneys because of the unique function he or she performs in representing the interests, and in exercising the sovereign power, of the state. [Citation.] As the United States Supreme Court has explained, the prosecutor represents "a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." (*Berger v. United States* (1935) 295 U.S. 78, 88.).' " (*People v. Hill* (1998) 17 Cal.4th 800, 820 (*Hill*).) At the same time, "[a] prosecutor may 'vigorously argue his [or her] case, and is not limited to "Chesterfieldian politeness[.]" ' " (*People v. Fosselman* (1983) 33 Cal.3d 572, 580.)

Claims of prosecutorial misconduct are governed by separate federal and state standards. " 'A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury.' [Citation.] When a claim of misconduct is based on the prosecutor's comments before the jury, . . . ' "the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." ' " (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 305.)

Allegations of prosecutorial misconduct are subject to waiver. "To preserve a claim of prosecutorial misconduct for appeal, a criminal defendant must make a timely objection, make known the basis of his objection, and ask the trial court to admonish the jury." (*People v. Brown* (2003) 31 Cal.4th 518, 533.) The purpose of the waiver rule " 'is remedial in nature, and seeks to give the court the opportunity to admonish the jury,

44

instruct counsel and forestall the accumulation of prejudice by repeating improprieties, thus avoiding the necessity of a retrial. . . . ' " (*Ibid.*)  The requirements of an objection and a request for admonishment are excused only if an objection or request for admonishment would have been futile; an admonition would not have cured the harm caused by the misconduct; or the court immediately overrules an objection, leaving the defendant with no opportunity to request an admonishment.  (*People v. Boyette* (2002) 29 Cal.4th 381, 432, citing *Hill*, *supra*, 17 Cal.4th at pp. 820-821.)

Rosa claims that the prosecutor disparaged her testimony during cross-examination, based on the following exchange:

[Prosecutor]:  "Your daughter was being sexually assaulted in front of your very eyes and what did you do to stop it, Ms. Hill?

[Rosa]:  "I tried to get him to open the door.

[Prosecutor]:  "Baloney.

[Rosa's counsel]:  "Objection.  That's argumentative.

[Mei's counsel]:  "Objection.

The Court:  "Sustained.

[Prosecutor]:  "I apologize to the Court.  I'm sorry."

Rosa acknowledges that the objections were sustained, but complains that this outburst from the prosecutor was improper and highly prejudicial.  We agree that the prosecutor's response was improper and the objections were correctly sustained.  However, if defense counsel felt that any other curative action was required, it was counsel's responsibility to ask the trial court to admonish the jury to disregard the improper remark.  (*Hill*, *supra*, 17 Cal.4th at p. 820; *People v. Visciotti* (1992) 2 Cal.4th 1, 79.)  Defense counsel requested no such admonition, and we find no basis for concluding that such a request would have been futile or would not have cured any alleged misconduct.  (See *Hill*, *supra*, at p. 820.)  The issue is forfeited on appeal.  However, even on the merits, we would find no prejudice because the improper statement was brief, the objections were sustained, the prosecutor moved on, and there was no recurrence.

Next, Rosa argues the prosecutor committed misconduct by misstating the evidence during his closing arguments, "most significantly regarding the circumstances of the death of [Selma] Hill." As the first such instance, Rosa cites the prosecutor's statement: "[Ninety-one] years old. And you just don't do that to an old person. Over and over, over and over, blow after blow, tased after tased." Counsel objected that this misstated the evidence, and the court admonished the jury: "Ladies and gentlemen, you've heard the evidence. Rely upon your own recollection and the logical inferences that can be drawn from the evidence that you've heard."

The prosecutor continued: "Dr. Rogers said that there were numerous sites on [Selma] Hill's body that had the, quote, unquote, heat effect, four to five of them. Coagulation. Heat. Consistent with the fact that they occurred in life. Hit over and over again, tased multiple times, and hit again. 91 years old. When you do an act to a 91-year-old person like that, we don't care what your state of mind is. It's as dangerous as dropping a cinderblock off the side of a freeway with oncoming traffic. In fact, it's worse. There could be no other conclusion about what your acts are going to do to an old person like [Selma] when you do the things that they did to her." In response to defense counsel's objection that the argument misstated the testimony, the court again instructed the jurors to "rely upon your own recollection of the evidence, please."

Subsequently, the prosecutor argued:

[Prosecutor]: "The cause of death to [Selma] Hill was asphyxiation, and this is Dr. Rogers' conclusion: Asphyxiation due to strangulation associated with multiple blunt injuries. He testified that the normal person, typical person, dies three to five minutes as a result of this. That was his testimony. And he says that the death was consistent with manual strangulation. That's medical terminology for, you put your hands on someone's throat and you squeezed it until they died.

[Rosa's counsel]: "Your Honor –

[The Court]: "Ladies and gentlemen, you've heard the evidence and you draw your own conclusions from the evidence. Counsel can make logical arguments that flow from

46

inferences that are established by the evidence. [¶] The objection is overruled. [¶] Ms. Narby [Rosa's counsel], you can nod your head negatively all you want.

[Rosa's counsel]: "I never –

[The Court]: "I understand the record. I understand the evidence, and I'm sure you're going to argue your view of it, but not at this stage."

Rosa cites other instances in the record where defense counsel objected that the prosecutor was misstating the evidence, but she identifies these examples by page number only. Summarizing these claims based on our review of the record, it appears that Rosa takes issue with statements to the effect that: (1) Mei lied to Eric about where his grandmother was "because Mei knew that something was really wrong with [Selma]"; (2) Rosa's testimony that she did not lose a gun in the place where it was found was a "red herring"; (3) Rosa tased Selma four to five times; (4) Ping stayed slumped down inside the Prius and did not get out or inquire about his wife, even when emergency vehicles arrived and police taped off the street; (5) Rosa told multiple lies when she testified; (6) the jury should compare the handwriting on different pieces of evidence and note the differences; and (7) Rosa and Mei did not tell anyone that they lived in Brentwood because Brentwood was where all the evidence was, including the computer "with all the searches."

For the most part, the court overruled the objections and/or admonished the jury to rely on their own recollection of the evidence. The court also advised that "[c]ounsel can draw logical inferences that flow from the evidence that has been presented," and that the statements of the attorneys are not evidence.

When a claim of prosecutorial misconduct is based on claims that a prosecutor has misstated or mischaracterized evidence, the California Supreme Court has explained that " ' " 'a prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom.' " ' " (*Hill*, *supra*, 17 Cal.4th at pp. 819-820.) Moreover, "[w]hile counsel is accorded 'great latitude at argument to urge whatever conclusions counsel believes can properly be drawn from the

47

evidence [citation],' counsel may not assume or state facts not in evidence [citation] or mischaracterize the evidence [citation].  ' "Whether the inferences the prosecutor draws are reasonable is for the jury to decide." ' "  (*People v. Valdez* (2004) 32 Cal.4th 73, 133-134.)  Further, "[a]lthough defendant singles out words and phrases, or at most a few sentences, to demonstrate misconduct, we must view the statements in the context of the argument as a whole." (*People v. Dennis* (1998) 17 Cal.4th 468, 522.)

We have considered all of Rosa's claims of error, and find none of them, nor the totality of them considered together, to constitute prosecutorial misconduct.  Rosa identifies no specific misstatements of the evidence; nor does she explain in what ways a particular statement was inaccurate or a mischaracterization.  Our review has uncovered no instance in which the prosecutor's argument was not supported by the evidence or inferences that could be drawn from the evidence, including, inter alia, evidence pertaining to Selma Hill's age and health, the pathologist's testimony regarding the injuries Selma sustained and the cause of her death, Rosa's testimony regarding her actions in hitting and tasing Selma, and evidence recovered at the Brentwood house.  The court admonished the jury repeatedly to rely on its own understanding of the evidence.  The court also instructed the jury pursuant to CALJIC No. 1.02 that the statements of the attorneys are not evidence, and the jury is presumed to have followed this instruction. (See *People v. Holt* (1997) 15 Cal.4th 619, 662.)  We find the challenged statements here to be vigorous but fair comment on the evidence, including logical inferences and deductions drawn therefrom.  (See *Hill*, *supra*, 17 Cal.4th at p. 819; *People v. Wharton* (1991) 53 Cal.3d 522, 567.)

Rosa also argues that the remarks were an improper appeal to the passions or prejudices of the jury.  This court has recognized that " ' "It is, of course, improper to make arguments to the jury that give it the impression that 'emotion may reign over reason,' and to present 'irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role, or invites an irrational, purely subjective response.' [Citation.]" ' [Citation.]  'It has long been settled that appeals to the sympathy or passions of the jury are inappropriate at the guilt phase of a criminal trial.' " (*People v.*

48

*Vance* (2010) 188 Cal.App.4th 1182, 1192.) Rosa raises this contention for the first time on appeal, however. As we have stated, an objection that is not raised in the trial court is not preserved for appeal. (*Hill*, *supra*, 17 Cal.4th at p. 820.)

Even on the merits, we find the prosecutor's comments to be vigorous, but not improper, argument. Rosa does not elaborate or explain her contention that the prosecutor "repeatedly engaged in . . . inflammatory rhetoric", apparently concluding that the transcript will speak for itself. She cites cases that stand for the proposition that it is improper for the prosecutor to appeal to passion or prejudice in closing argument, namely, *People v. Pensinger* (1991) 52 Cal.3d 1210, 1250, and *People v. Simington* (1993) 19 Cal.App.4th 1374, 1378, but these cases are readily distinguishable. In *Simington*, the prosecutor asked the jurors to put themselves in the victim's shoes by imagining themselves on the way home from jury service and confronted with a much larger assailant with a knife who demands money and stabs them. (19 Cal.App.4th at p. 1378.) In *Pensinger*, which involved offenses including kidnapping and murder of a child, the prosecutor asked the jurors to imagine that the child victim was their own child, not someone else's child. (52 Cal.3d at p. 1250.) The prosecutor's remarks here emphasized that Selma was 91 years old, frail, and that she sustained a number of injuries consistent with blunt force trauma and heat. We find no improper appeal to passion or prejudice.

Finally, Rosa argues she was severely prejudiced by the prosecutor's misconduct. She contends the case was close, as evidenced by 18 hours of jury deliberations during which time the jury sent six notes to the court, and the verdicts must have been affected by the misconduct, given " 'the special regard the jury has for the prosecutor.' " (*People v. Bolton* (1979) 23 Cal.3d 208, 213.) We disagree. Even were we to find misconduct by the prosecutor in exaggerating the facts or appealing to the passions of the jury, we would nevertheless conclude that the error was harmless under either federal or state law. On this record, any such misconduct "did not ' " ' "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process" ' " ' in violation of the federal Constitution." (*People v. Wallace* (2008) 44 Cal.4th 1032, 1071; see *Hill*, *supra*, 17

49

Cal.4th at p. 819.) Moreover, considering each of the challenged comments in context, "we simply cannot conclude that the prosecutor used a method to persuade the jury that was 'deceptive' or 'reprehensible' " in violation of California law. (*People v. Berryman* (1993) 6 Cal.4th 1048, 1072, overruled on another ground in *Hill*, *supra*, 17 Cal.4th at p. 823, fn. 1.) There is no reasonable probability that a result more favorable to Rosa would have been reached without the alleged misconduct. (See *People v. Wallace*, *supra*, 44 Cal.4th at p. 1071; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

F. *Sufficiency Of The Evidence Of Attempted Murders*

Both Rosa and Mei contend that the evidence is insufficient to sustain their convictions for the attempted murder of Eric. They point out that they brought many more weapons to Selma's house than they actually used in attacking Eric, and asked him during the attack to give up Elizabeth, contending this shows they did not intend to kill him.

A conviction that is not supported by substantial evidence violates the due process clauses of both the Fourteenth Amendment to the United States Constitution and article I, section 15 of the California Constitution. (*Jackson v. Virginia* (1979) 443 U.S. 307, 317-319; *People v. Rowland* (1992) 4 Cal.4th 238, 269.) "In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.) "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of facts' findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment." ' " (*People v. Bean* (1988) 46 Cal.3d 919, 932-933.) We may reverse for lack of substantial

evidence only if " 'upon no hypothesis whatever is there sufficient substantial evidence to support' " the conviction. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

To sustain a conviction for attempted murder, the evidence must demonstrate "the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Lee* (2003) 31 Cal.4th 613, 623; *People v. Chinchilla* (1997) 52 Cal.App.4th 683, 690.) An intent to kill is usually not shown by direct evidence; rather, such intent may be inferred from the defendant's acts and the underlying circumstances. (*People v. Smith* (2005) 37 Cal.4th 733, 741.) Rosa concedes there is substantial evidence that she committed an assault and battery upon Eric, but argues there is insufficient evidence that she meant to kill him. Mei joins in Rosa's argument, contending also that there is no substantial evidence that she intended to kill Eric.

The cases Rosa relies on, *People v. Miller* (1935) 2 Cal.2d 527 (*Miller*), and *People v. Belton* (1980) 105 Cal.App.3d 376 (*Belton*), do not help her. In *Miller*, the defendant had threatened to kill the victim, and walked toward him with a rifle, stopped some 200 yards away and appeared to load the rifle but did not lift it as though taking aim. The victim fled and the defendant was disarmed without incident. (2 Cal.2d at p. 529.) The issue presented on appeal was not whether there was sufficient evidence the defendant had the specific intent to commit murder, but whether there was sufficient evidence of a direct but ineffectual act done towards its commission. (*Id.* at pp. 529-530.) The defendant's act of walking toward the victim with a rifle was "mere preparation," as distinguished from an act in commencement of an attempt to kill, and thus did not constitute an attempt to commit murder. (*Id.* at pp. 531-532.)

The other case Rosa relies on, *Belton*, *supra*, 105 Cal.App.3d 376, addressed the issue of intent to kill, but it is distinguishable. In *Belton*, twice in one night, the defendant set fire to the apartment building his ex-wife lived in and owned. The evidence showed that the defendant and his ex-wife had spent the day at her apartment in "reasonable tranquility." There was no animosity between them, no threats, and no talk of arson. He was convicted of arson and attempted murder. (*Id.* at pp. 378-380.) On

51

appeal, the court upheld the arson convictions but reversed the attempted murder conviction because there was no evidence the defendant set the fires with the specific intent to murder his ex-wife. To prove intent, the prosecution relied on a domestic disturbance between the defendant and his ex-wife that occurred three months before the fires, but she testified that there had been no other such incidents. The court found "any deduction of murderous intent from a quarrel three months earlier [was] entirely speculative and conjectural." (*Id*. at p. 380.) The court held that an intent to kill must be proved and could not be inferred from the fact of the arsons, just as an intent to kill could not be inferred from the fact of any other crime. "Just as proof of assault with a deadly weapon does not itself provide the basis for an inference of intent to murder, so proof of arson of an inhabited building does not itself provide the basis for an inference of attempted murder. More is needed to establish murderous intent, which cannot be presumed solely from the commission of some other crime, but which must be affirmatively proved by direct evidence or by solid inference." (*Id*. at p. 381.)

Here, there was more evidence of intent to kill than just the commission of assault with a deadly weapon. First, there was substantial evidence of pre-existing animosity: the contentious custody dispute, Rosa's stated fear of Eric, her claims that he was molesting Elizabeth, and the numerous computer searches at the Brentwood and Antioch homes for poisons, methods of killing, how to get away with murder and the like. Rosa went to Selma's house that day armed to the teeth, and she and Mei attacked Eric with a Taser and a baton, which was used both to beat him and to choke him. Eric testified that he realized he was in a fight for his life, and agreed to give up Elizabeth because he did not want to die. According to her own testimony, Rosa had already killed Selma that day by use of a stun gun and a broom. This constitutes sufficient evidence from which the jury reasonably could have inferred intent to kill and not merely an assault.

Rosa and Mei argue that if they had wanted to kill Eric, they would have used some of the more lethal weapons Rosa brought to the house and would not have questioned Eric about giving up custody of Elizabeth. Mei also points out that she stopped choking Eric with the baton when he agreed to give up Elizabeth. In effect, they

argue that we should re-weigh the evidence and come to a different conclusion. However, under the applicable standard of review, we are bound to view the evidence in the light most favorable to the prosecution and to presume the existence of every fact the jury could reasonably deduce from the evidence in support of the judgment. (*People v. Smith*, *supra*, 37 Cal.4th at p. 742.) We conclude the evidence is sufficient to support appellants' convictions of the attempted murder of Eric.

G. *Ineffective Assistance Of Counsel*

Rosa contends she received ineffective assistance of counsel based on her trial counsel's failure to request that the court instruct, as to count two, the attempted murder of Eric, on the lesser related offense of assault with a deadly weapon.

To prevail on a claim of ineffective assistance of counsel, the burden is on the defendant to show (1) counsel's performance was deficient in that it fell below an objective standard of reasonableness under prevailing professional norms, and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the defendant would have obtained a more favorable result, i.e., counsel's deficient representation prejudiced the defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688; *People v. Gray* (2005) 37 Cal.4th 168, 206-207; *People v. Lewis* (1990) 50 Cal.3d 262, 288.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland v. Washington*, *supra*, 466 U.S. at p. 694.)

As Rosa acknowledges, assault with a deadly weapon is not a lesser included offense of attempted murder; rather, it is a lesser related offense. (*People v. Nelson* (2011) 51 Cal.4th 198, 215.) A defendant has no unilateral entitlement to instruction on a lesser related offense. (*People v. Birks* (1998) 19 Cal.4th 108, 136-137; *People v. Kraft* (2000) 23 Cal.4th 978, 1064 [defendant has no right to instructions on a lesser related offense (accessory after the fact as a lesser related offense to murder) even if he requests them and the instructions would have been supported by the evidence].) An instruction on an uncharged lesser related offense may only be given with the consent of the prosecutor. (*People v. Birks*, *supra*, 19 Cal.4th at pp. 136-137.) Thus, even if reasonably competent counsel would have requested an instruction on assault with a deadly weapon

in this case, Rosa cannot make the required showing of prejudice without showing the prosecutor would have agreed to it. (*Strickland v. Washington*, *supra*, 466 U.S. at p. 697 ["If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed"].) She has not made that showing. Accordingly, her claim of ineffective assistance fails. (*Ibid.*)

H. *Whether The Trial Court Erred In Failing To Respond To A Jury Question*

Next, Rosa contends the trial court failed to respond to a jury question during deliberations in violation of her constitutional right to a fair trial.

On June 27, 2011, the third day of deliberations, the jury submitted its fifth note to the court requesting "clarification on if a Taser is legally considered a firearm or not." Both parties advise us that the record does not contain a response from the trial court to this question. The parties also agree that section 1138 imposes a mandatory duty on the trial court to clarify any instructional confusion expressed by the jury. Rosa contends the absence of a response by the court violated her section 1138 rights (see, e.g., *People v. Beardslee* (1991) 53 Cal.3d 68, 97) and, under the circumstances, likely caused the jury to misapply the law in concluding that she was armed with a firearm during her commission of the murder of Selma. (See *Estelle v. McGuire* (1991) 502 U.S. 62, 72 & fn. 4.) On the other hand, the Attorney General contends the failure of trial counsel to object waived any claim of error on appeal (*People v. Thoi* (1989) 213 Cal.App.3d 689, 698) and that a silent record does not establish error (*People v. Goodloe* (1964) 225 Cal.App.2d 686, 688-689; *In re Salazar* (1962) 205 Cal.App.2d 102, 105.)

We have undertaken our own review of the record. The minutes for June 27, 2011, day forty-five of the jury trial, contain inter alia the following entries:

11:11 a.m.   (**Not Reported**)  Jury submits Jury Request #5. Counsel is informed of the Juror's [sic] question in Jury Request #5 and stipulate to it's [sic] answer.

11:26 a.m.   (**Not Reported**)  Answer to Jury Request #5 is sent to the Jury Deliberation room. The Court stands in recess to await the jury's call.

 Thus, the record contradicts Rosa's assertion and demonstrates that the jury received a response. There was no error.

54

I. *Cumulative Error*

Finally, both Rosa and Mei contend that, even if no single error requires reversal, the cumulative effect of the errors in this case requires reversal. (See *Hill*, *supra*, 17 Cal.4th at p. 844.) The "litmus test" for such a claim is "whether defendant received due process and a fair trial." (*People v. Kronemyer* (1987) 189 Cal.App.3d 314, 349, disapproved on another ground in *People v. Whitmer* (2014) 59 Cal.4th 733, 742.) "Accordingly, we review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a result more favorable to defendant in their absence." (*Ibid*.)

Rosa relies on *Hill*, *supra*, 17 Cal.4th at page 845, in arguing that "the number of 'legal errors raises the strong possibility the aggregate prejudicial effect of such errors was greater than the sum of the prejudice of each error standing alone.' " However, we have found no substantial error in any respect, and we reject Rosa's cumulative error argument. (See *People v. Butler* (2009) 46 Cal.4th 847, 885; *Hill*, *supra*, 17 Cal.4th at pp. 844-845.)

Mei contends "had it not been for the various instructional errors concerning [her] culpability for Selma's murder, it is unlikely that the jury would have found the 100 pound appellant guilty of the attempted premeditated murder of Eric." With respect to Mei's appeal, we have found the instructional error related to count one was prejudicial and reversal of that conviction is required. However, we have found no other errors, and we now conclude Mei was not deprived of a fair trial on either or both of the other two counts.

In addition to her conviction for the murder of Selma, which we reverse, Mei was also convicted of burglary and the attempted murder of Eric. Both of these convictions were based on Mei's own actions at Selma's house, as opposed to the murder conviction, which was based on Mei's complicity in Rosa's actions. The reversal is based on the instructional error of failing to inform the jury that Mei's culpability for felony murder on an aiding and abetting theory required a finding that Mei was aiding and abetting Rosa at the time Selma was killed. This instructional error had no bearing on Mei's guilt or

innocence of the attempted murder of Eric. The jury clearly rejected Mei's position at trial that she had no idea what Rosa was doing and went to Selma's house that day with no criminal intent. We find no reasonable probability that Mei would have achieved a more favorable result as to counts two and three in the absence of the count one instructional error. (See *Veronese v. Lucasfilm Ltd*. (2012) 212 Cal.App.4th 1, 32; *People v. Kronemyer*, *supra*, 189 Cal.App.3d at p. 349.) We reject Mei's claims that her trial was fundamentally unfair and her convictions a miscarriage of justice.

## IV.  DISPOSITION

Mei's conviction for first degree murder is reversed, and the matter is remanded for further proceedings consistent with this opinion. In all other respects, the judgments are affirmed.

_____

STEWART, J.

We concur.

_____

KLINE, P.J.

_____

RICHMAN, J.

Filed 5/13/15

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ROSA PUI HILL et al.,<br><br>        Defendants and Appellants. | A133121<br><br>(Alameda County<br>Super. Ct. No. C162185A) |

BY THE COURT:

        The opinion in the above-entitled matter filed on April 16, 2015, was not certified for publication in the Official Reports. For good cause and pursuant to California Rules of Court, rule 8.1105, it now appears that the opinion should be certified for partial publication in the Official Reports, with the exception of parts III.A., III.B., III.D., III.E., III.F., III.G., III.H. and III.I., and it is so ordered.

Dated: _____          _____
                                                               Kline, P.J.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts III.A, III.B, III.D., III.E, III.F, III.G., III.H. and III.I.

1

| | |
|---|---|
| Trial Court: | Alameda County Superior Court |
| Trial Judge: | Hon. Kenneth M. Burr |
| Counsel for Defendant and Appellant Rosa Pui Hill: | John Francis McCabe II, under appointment by the Court of Appeal |
| Counsel for Defendant and Appellant Mei Yuk Li: | Law Offices of Robert J. Beles<br>Robert J. Beles<br>Paul Gilruth McCarthy<br>John Patrick McCurley |
| Counsel for Plaintiff and Respondent: | Kamala D. Harris<br>Attorney General of California<br><br>Dane R. Gillette<br>Gerald A. Engler<br>Chief Assistant Attorneys General<br><br>Seth K. Schalit<br>Supervising Deputy Attorney General<br><br>Sharon R. Wooden<br>Dorian Jung<br>Deputy Attorneys General |

Filed 5/13/15

**CERTIFIED FOR PARTIAL PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ROSA PUI HILL et al.,<br><br>    Defendants and Appellants. | A133121<br><br>(Alameda County<br>Super. Ct. No. C162185A)<br><br>**ORDER MODIFYING OPINION<br>[NO CHANGE IN JUDGMENT]** |

BY THE COURT:

The opinion filed on April 16, 2015, and certified for partial publication on May 13, 2015, is modified as follows:

All references to the minor child shall be changed to initials "E.H."

Dated:_____                     _____P.J.

1

| | |
|---|---|
| Trial Court: | Alameda County Superior Court |
| Trial Judge: | Hon. Kenneth M. Burr |
| Counsel for Defendant and Appellant Rosa Pui Hill: | John Francis McCabe II, under appointment by the Court of Appeal |
| Counsel for Defendant and Appellant Mei Yuk Li: | Law Offices of Robert J. Beles<br>Robert J. Beles<br>Paul Gilruth McCarthy<br>John Patrick McCurley |
| Counsel for Plaintiff and Respondent: | Kamala D. Harris<br>Attorney General of California<br><br>Dane R. Gillette<br>Gerald A. Engler<br>Chief Assistant Attorneys General<br><br>Seth K. Schalit<br>Supervising Deputy Attorney General<br><br>Sharon R. Wooden<br>Dorian Jung<br>Deputy Attorneys General |